**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Terry Don LEACH,
Defendant-Appellant.**

No. 83–2362.

United States Court of Appeals,
Tenth Circuit.

Nov. 26, 1984.

Rehearing Denied Feb. 14, 1985.

Kenneth P. Snoke, Asst. U.S. Atty., Tulsa, Okl. (Layn R. Phillips, U.S. Atty., and Ben F. Baker, Asst. U.S. Atty., Tulsa, Okl., on brief), for plaintiff-appellee.

Carol J. Russo, Tulsa, Okl., for defendant-appellant.

Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

Terry Don Leach (Leach) appeals his conviction following trial to the court, Honorable H. Dale Cook presiding, on counts 1 through 5 for the crime of uttering and passing forged counterfeit obligations of the United States pursuant to 18 U.S.C. § 472 (Leach was acquitted on counts 6 and 7.) The court entered sentence as follows: count 1, three years imprisonment; count 2, three years imprisonment to run concurrent with count 1; probation of five years on each of counts 3, 4 and 5 to commence at the expiration of the sentence.

*Factual Background*

An Indictment identical in material allegations to the Indictment upon which Leach was convicted, and from which he now appeals, was filed against Leach on the 7th day of December, 1982, in the District Court for the Northern District of Oklahoma, bearing Case No. 82–CR–160. That Indictment was dismissed by the Government on the 9th day of February, 1983.

The Indictment upon which Leach was convicted, and from which he now appeals, was filed on the 8th day of June, 1983, in the District Court for the Northern District of Oklahoma. The Grand Jury charged, in counts 1 through 5, that Leach did, with intent to defraud, pass and utter to various retail establishments, forged and counterfeited obligations of the United States, that is, counterfeit $100 Federal Reserve Notes, purportedly drawn on the Federal Reserve Bank of Chicago, Illinois, "Series 1977, Check Letter C. Quadrant Number 2, Face Plate 109, Back Plate 54, Serial Number G11188646A" which Leach knew to be forged and counterfeited, in violation of 18 U.S.C. § 472.

Some pretrial motions were filed by Leach on July 8, 1983, which were sealed and placed in the court vault, pursuant to a request by Leach for a protective order that was granted by the court. The Government filed its responses to Leach's pretrial motions on July 12, 1983. Some of these responses were sealed and placed in the court vault, pursuant to the previously issued protective order.

In Camera conferences were held on July 26, 1983, and August 1, 1983, the subject of which were the sealed motions of Leach and the sealed responses by the Government.

Even though the argument and testimony submitted during the In Camera conferences cannot be discussed herein, Leach does rely on those matters as his primary basis of appeal. The trial court denied Leach's sealed motions, and, at the conclusion of the second conference, a hearing was held in open court on Leach's Motion to Suppress.

At the hearing on the Motion to Suppress, Secret Service Agent Donald R. Newsom (Agent Newsom) testified; during this testimony, over defense objection, a written statement by Leach was admitted. Leach testified at that hearing as to the voluntariness of his written statement. The Motion to Suppress was denied. The case was then set for jury trial on August 15, 1983. On that date, Leach waived his right to jury trial and trial was set for August 19, 1983. Leach filed a motion for a statement of particulars on August 26, 1983. That motion was not ruled on prior to trial.

On August 29, 1983, the case came on for non-jury trial. The following testimony and evidence was adduced at trial:

1. With respect to COUNT 1: Leach was charged with passing a counterfeit $100 note at a Pure-Gold service station in Tulsa, Oklahoma, on October 14, 1982. Government witness Phyllis Lancaster testified that she was employed at Guaranty National Bank in Tulsa, and detected the counterfeit note in a bank deposit on October 14, or October 15, 1982; she did not know where the counterfeit note came from, nor did she initial it. Agent Newsom testified that his office was then contacted, and his office subsequently received and retained the counterfeit note.

2. With respect to COUNT 2: Leach was charged with passing a forged counterfeit

$100 note at a Skaggs store in Tulsa, Oklahoma, on October 14, 1982. Jack Williams testified that he was the manager of that store on that date. He detected a counterfeit $100 note in one of the cashier drawers, and then contacted the Tulsa Police Department, who received the note and transported it to the Tulsa Police Department property room. The testimony of Tulsa police officer Don Baker, as to his receipt and transportation of the note, was stipulated and accepted by the court. Agent Newsom testified that his office subsequently received that note.

3. With respect to COUNT 3: Leach was charged with passing a counterfeit $100 note at a Burger King restaurant in Tulsa, Oklahoma, on October 14, 1982. Bill Hodges testified that he was an employee of F & M Bank in Tulsa, Oklahoma, on that date. He testified that some time thereafter a counterfeit note was received at the bank where he was employed; he did not know where the counterfeit note came from, nor that it was received on or about October 14, 1982. Agent Newsom testified that his office subsequently received a counterfeit $100 note from F & M Bank in Tulsa.

4. With respect to COUNT 4: Leach was charged with passing a counterfeit $100 note at a Braum's Ice Cream store in Tulsa, Oklahoma, on October 14, 1982. Cora Powers testified that on October 14, 1982, she was employed at the Braum's store in question. She received what was later determined to be a counterfeit $100 note during the course of her employment on that date. She testified that a cowboy-looking man between the age of thirty and forty years of age had, she thought, passed the note. She testified that she put it, with other cash receipts, in the store safe. She did not know that it was counterfeit at the time. Regina Searles testified that as an employee of Brookside State Bank in Tulsa, Oklahoma, she received the deposit from Braum's Ice Cream store, and discovered the $100 note to be counterfeit. There were no initials on the note. She turned it over to her supervisor. Agent Newsom testified that his office subsequently received the counterfeit note from Brookside State Bank, and retained control over it until trial.

5. With respect to COUNT 5: Leach was charged with passing a counterfeit note at a Wendy's Old-Fashioned Hamburgers store in Tulsa, Oklahoma, on October 14, 1982. Gary Saas testified that he was the manager of that Wendy's, when he received a counterfeit note. He did not know the exact date. He testified that he determined the note to be counterfeit upon receipt of it, and described the vehicle in which the passer of the counterfeit note was driving as a Chevrolet Blazer, late model, bearing vehicle tag MKK 658. He initialled the note and gave it to a Tulsa Police officer. He testified that approximately two to three weeks after the incident a Secret Service agent brought him a photographic line-up consisting of four photos. He identified one of the four photos as looking most like the person who passed the note. He further testified that the person who passed the note was approximately twenty-five to thirty years of age, had brown hair, stood approximately 5 foot 10 inches, and weighed between 160–180 Lbs. Agent Newsom testified that his office received the note and retained control over it until trial.

Gary Humphrey testified that he was the owner of the vehicle described by witness Gary Saas. He testified, in pertinent part, that he had loaned this vehicle to Leach some time prior to October 14, 1982, and did not receive it back from him until some time after that date.

None of the Government witnesses identified Terry Don Leach as the person who passed a forged $100 note to any of them.

Agent Newsom testified, in pertinent part, that many other counterfeit notes, identical in every respect to those for which Leach was charged, were passed in Tulsa, Oklahoma between October 12, 1982, and November 1, 1982; that Leach was not charged with having passed any of those notes, and that his office did not possess any evidence to suggest that Leach passed or uttered those notes.

In addition to Leach's own statement admitting the actual offenses charged placing him at the place or scene on specific dates, the evidence is undisputed that Leach knew the $100.00 bills to be counterfeit. To be sure, positive identification was lacking, but Leach's sworn statement of involvement is corroborated by direct and circumstantial evidence and reasonable inferences to be drawn therefrom. The record contains Agent Newsom's expert testimony that each note was counterfeit. Leach's presence in Tulsa, Oklahoma, during the period the counterfeit bills were passed was corroborated by a Mr. Humphrey, who had previously loaned Leach a 1978 blue and silver chevrolet suburban; witness Saas, the manager of Wendy's store in Tulsa on October 14, 1982, identified the automobile the person who passed the $100.00 counterfeit bill that date was operating by make, model and vehicle license number. The vehicle was registered to Mr. Humphrey, who had previously loaned it to Leach.

At the conclusion of the Government's case-in-chief, Leach moved for a judgment of acquittal, which was denied by the court. Leach rested. The trial court then found Leach guilty on Counts 1 through 5 and not guilty on Counts 6 and 7.

### Appellate Contentions

On appeal, Leach contends that his convictions should be reversed because he was denied a fair and impartial trial, through no fault of his own, and that the convictions were obtained in violation of his rights to due process of law. He points to these specific errors by virtue of the trial court's actions: (1) overruling his sealed motion and brief to dismiss, (2) overruling his motion and brief to suppress incriminating statements not shown to be the product of a free, knowing, voluntary and intelligent waiver of the privilege against self-incrimination and the right to counsel, and (3) overruling his motion for verdict of acquittal.

### I.

Leach contends that the trial court committed reversible error in failing to sustain his sealed motion to dismiss, with attached affidavit based upon a plea agreement unilaterally determined by the Government to have been breached by Leach, in violation of constitutional principles of fairness and sound public policy. We have carefully studied the record, including the sealed portions thereof, and conclude that this contention must fail. We find no error in the trial court's denial of Leach's motion to dismiss.

Our discussion of the factual background surrounding this issue is necessarily limited in light of a Protective Order issued by the District Court on July 26, 1983, upon the motion of Leach in regard to the factual basis for the plea agreement entered into between Leach and various Federal and State prosecutorial offices and related agencies.

The crimes involving the convictions here appealed were committed on or about October 14, 1982. They were committed in the City of Tulsa, in the Northern District of Oklahoma. Leach was originally indicted on December 7, 1982, to charges identical to those involved here. Considerable investigation led Agent Newsom to make telephone contact with Leach several days prior to November 2, 1982, during which Newsom requested a meeting with Leach to discuss the counterfeit matters. Leach agreed. He was not under arrest at the time and the meeting was held first at an auto service dealer's place in Muskogee, Oklahoma, and subsequently in the office of the United States Attorney for the Eastern District of Oklahoma in Muskogee. Leach reduced his admissions that he had passed counterfeit notes in Tulsa on October 14, 1982, to a written statement which, over objection, was admitted in evidence, marked Government's Exhibit 8, attached hereto and by reference made a part hereof. The admissibility of this exhibit was the subject of a prior hearing held on Leach's motion to suppress which had been denied by the trial court. Agent Newsom

testified that, in addition to the counterfeit bills charged in the Leach indictment, some twenty to twenty-five such counterfeit bills had been passed in the Tulsa area between October 15 and the end of October, 1982. (R., Vol. VIII, p. 70.) Further, Agent Newsom testified that approximately 384 such counterfeit notes had been passed in the Tulsa area and received in his office during the year 1982. *Id.* at 72. Many of these notes were manufactured from the same press or "face plate" that the notes for which Leach was charged were manufactured. *Id.* at 71. Agent Newsom had no reason to believe that Leach had passed any of the counterfeit bills other than those with which he was charged. *Id.* at 74. Because of the proliferation of counterfeit notes in the Tulsa area, it was the primary, critical concern of the Secret Service to trace the activity to the source, i.e., to those who were printing the counterfeit notes. This concern was expressly recognized by Leach. He testified at the November 2, 1982, meeting with Agents Newsom and Dade that they (the Government agents) were "[i]nterested in the people that were printing the (counterfeit) money, not the little guy but the big guy." (R., Vol. VII, p. 26.) Thus, there can be no question that Leach fully understood that the Secret Service was interested in obtaining from him any information helpful to the identification and arrest of those who were manufacturing the counterfeit notes.

At the time Leach was contacted by Agents Newsom and Dade on November 2, 1982, he was under indictment in the United States District Court for the Eastern District of Oklahoma on *Dyer Act* (18 U.S.C. § 2312) charges. He had previously entered into an agreement with the United States attorney in that district to "cooperate" fully with the offices of the United States attorney and the F.B.I. relative to car theft activities in that district. Leach fully cooperated with those officials and, as a result, the charges filed there against Leach were dismissed. Furthermore, because of the initiative taken by Leach and his counsel in terms of cooperation with law enforcement arms, dismissal of

charges against Leach in Muskogee County District Court were accomplished so that Leach could effectively continue his "cooperation" with the F.B.I. involving the car theft investigation in the Eastern District of Oklahoma and like cooperation with State of Oklahoma and Muskogee County law enforcement officers.

While the above activities were being pursued, counsel for Leach approached the United States attorney for the Eastern District of Oklahoma relative to the charges pending against Leach in the Northern District of Oklahoma arising from the counterfeit bill passing foray on or about October 14, 1982. Prior thereto, Leach had met with Agents Newsom and Dade. In that meeting, Leach had offered to cooperate fully with them in their investigation (well knowing that they were concentrating particularly on those manufacturing the counterfeit notes), and had admitted that he had passed counterfeit $100.00 bills in Tulsa on or about October 14, 1982. With this background, the United States Attorney for the Eastern District of Oklahoma contacted the United States Attorney for the Northern District of Oklahoma and submitted Leach's proposal for the dismissal of the counterfeit charges to free Leach in order both to aid the officials in the Eastern District of Oklahoma and to protect Leach from prosecution by virtue of his full "cooperation" with the officials in the Northern District. The evidence of this transaction involves a letter from the United States Attorney of the Northern District of Oklahoma to the United States Attorney for the Eastern District of Oklahoma stating that the counterfeit charges against Leach would be dismissed without prejudice and, in effect, could be refiled within 45 days if Leach did not fully cooperate with the Secret Service in the Northern District. The letter was not directed to Leach, but Leach was fully aware that the dismissal of the Indictment in the Northern District was based on his "cooperation" with the Secret Service there in targeting the source of the counterfeit notes. Leach alleged below and on appeal that his "coop-

eration" was not possible because of personal jeopardy he was placed in by the Secret Service. We agree with the trial court that there was no credible evidence to support this contention.

Agent Newsom testified that Leach did not cooperate in the Secret Service investigation of the case. Leach was to obtain the source of the counterfeit notes from his cousin, Ricky Barron. He did not do so. The dismissal without prejudice of the counterfeit charges against Leach was clearly predicated on Leach's identification of the source, i.e., the manufacturer of the counterfeit notes, the "big guy." Leach utterly failed to cooperate in this regard. His excuse is not credible.

The trial court carefully analyzed the evidence and ruled that the agreement, whereby the charges pending in the Northern District of Oklahoma would not be refiled in return for Leach's cooperation with the Secret Service, was void *ab initio*. The trial court found that: Leach initiated the agreement in the hope that ultimately *all* charges then pending against him would be dismissed; at the time of the agreement, state charges involving revocation of Leach's probation sentence were pending, which were dismissed, together with indictments against Leach in both the Eastern and Northern Districts of Oklahoma; the dismissals were effected primarily to permit Leach greater freedom, opportunity, and latitude to cooperate with the F.B.I. in the Eastern District and the Secret Service in the Northern District; Leach initiated the agreement by suggesting to Agents Newsom and Dade that he could and would identify the manufacturers of the counterfeit notes; Leach's excuse for failure to so identify the source of the counterfeit notes is not credible; Leach misled the Secret Service initially and at all times, i.e., he lied when he offered his cooperation in identifying the source of the counterfeit notes. Based thereon the trial court concluded that: the agreement was *void ab initio* by virtue of Leach's fraudulent misrepresentation; contract law governs the agreement; Leach practiced fraud in the procurement of the agreement which vitiates and voids

the contract; and the Government did not violate the agreement. We agree.

This was not a plea bargain agreement as urged by Leach. It was simply an agreement whereby, in return for dismissal of particular charges *without prejudice* to refiling, Leach, as the party charged, agreed to cooperate with the Secret Service investigation by identifying the source of the counterfeit notes.

Leach contends that the Government's reindictment, subsequent to the plea agreement on June 8, 1983, was contrary to the laws of the United States or in derogation of his constitutional rights. We disagree. The plea agreement was initiated by Leach, who hoped to effect dismissal of *all* charges and/or proceedings filed against him in both Federal and State courts. In the instant case, the predicate for dismissal was that Leach would cooperate with the Secret Service in the Northern District of Oklahoma in identifying the *source* of the counterfeit bills. This he failed completely to accomplish, even though the original dismissal of charges in both the Eastern and Northern Districts of Oklahoma was designed to provide Leach with greater freedom, opportunity, and latitude in his cooperation with the F.B.I. and the Secret Service. The record is devoid of *any* evidence that Leach cooperated in identifying the source of the counterfeit notes, namely the "target" mentioned in the plea agreement with the officials in the Northern District.

## II.

■ Leach contends that the trial court erred by overruling his motion to suppress both his oral and written (typewritten) statements made to Agents Newsom and Dade on November 2, 1982. Leach contends that the Government did not sustain its burden of showing the same to be the product of his free will. Further, he contends that the record does not show that he knowingly, voluntarily and intelligently waived his privilege against self-incrimination and the right to counsel. We agree

with the trial court's determination that there is no merit in these contentions.

It was Leach who, in responding to Agent Newsom's initial telephone call, volunteered to be interrogated at the time and place of his choice with full knowledge that Agent Newsom wished to question him about counterfeit bills. Leach testified that he wished to speak to Agent Newsom so that Agent Newsom would not "put the dogs on me." Clearly, Leach was not under arrest when he met with Agents Newsom and Dade first at the garage area and later in the office of the United States Attorney. Leach argues now that he was somehow significantly deprived of his freedom, but he acknowledged that he agreed to meet with the agents and that at no time did they indicate that he was under arrest or that he could not leave. The common sense impression from this record is simply that Leach knew the "jig was up" on his passage of the counterfeit bills in the Tulsa area and he was intent on avoiding any punishment for his unlawful acts.

■ The trial court found that Leach was not in custody, that he voluntarily spoke with Agents Newsom and Dade about the counterfeit passage transactions, that he was not coerced, and that he was never under arrest or otherwise "in custody." Because Leach was not in custody, the Agents were not under legal compulsion to advise Leach of his rights mandated by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There was no degree of restraint exercised over Leach and there was no "in custody" interrogation conducted on November 2, 1983.

In *Rhode Island v. Innis,* 446 U.S. 291, 298–99, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980) the Supreme Court opined:

The starting point for defining "interrogation" in this context is, of course, the Court's *Miranda* opinion. There the Court observed that "[b]y custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* [384 U.S.] at

444 [86 S.Ct. at 1612] (emphasis added). This passage and other references throughout the opinion to "questioning" might suggest that the *Miranda* rules were to apply only to those police interrogation practices that involve express questioning of a defendant while in custody.

We do not, however, construe the *Miranda* opinion so narrowly. The concern of the Court in *Miranda* was that the "interrogation environment" created by the interplay of interrogation and custody would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination. *Id.* [384 U.S.] at 457–458 [86 S.Ct. at 1618–1619]....

In *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), the Supreme Court rejected an argument similar to that advanced by Leach that because he was a "target" of the counterfeit note investigation he was "in custody" for *Miranda* purposes:

Our holding in *Mathiason (Oregon v. Mathiason,* 429 U.S. 492 [97 S.Ct. 711, 50 L.Ed.2d 714] (1977)) reflected our earlier decision in *Beckwith v. United States,* 425 U.S. 341, 48 L.Ed.2d 1, 96 S.Ct. 1612 (1976) in which we rejected the notion that the "in custody" requirement was satisfied merely because the police interviewed a person who was the "focus" of a criminal investigation. We made clear that *"Miranda* implicitly defined 'focus' ... as 'questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.,* at 347 [96 S.Ct. at 1616] (cite omitted).

463 U.S. at ——, 103 S.Ct. at 3519, 77 L.Ed.2d at 1279 (n. 2).

*See also: United States v. Miller,* 643 F.2d 713 (10th Cir.1981); *United States v. Bridwell,* 583 F.2d 1135 (10th Cir.1978). In *Miller* we held that *Miranda* warnings were not required when police questioned Miller in his home prior to his arrest and under circumstances which did not deprive

him of his freedom of action and where the questioning was not coercive. In *Bridwell* we held that *Miranda* warnings were not required where a physician, then not under arrest, was questioned in his office and no indicia of coercion was evidenced.

The trial court was not clearly erroneous in its admission of the Leach statements of November 2, 1982. In *United States v. Rios*, 611 F.2d 1335, 1344 (10th Cir.1979), we said:

[W]hen reviewing the denial of a motion to suppress, an appellate court must accept the trial court's findings of fact unless they are "clearly erroneous," *United States v. Miles*, 449 F.2d 1272, 1274 (10th Cir.), and must consider the evidence adduced at the suppression hearing and the trial in the light most favorable to the Government.

The trial court did not err in denying Leach's motion to suppress the oral and typewritten statements of November 2, 1982.

### III.

Leach contends that the trial court committed reversible error by failing to sustain his motions for judgment of acquittal with respect to Counts I, II, III, IV, and V. He bases this contention on: (1) the Government's alleged failure to prove his guilt to the charges contained therein beyond a reasonable doubt; (2) the fact that a large number of counterfeit bills identical to those described in each count upon which Leach was convicted were passed in the Tulsa, Oklahoma, area in mid-October, 1982, by persons other than Leach; (3) the Government's alleged failure to place Leach at the scene of each alleged crime, and (4) the Government's alleged failure to produce any in-court identification of Leach to connect him to the offenses charged, thus denying him his constitutionally protected right to due process of law.

■ Appellant Leach's challenge is posited under Fed.R.Crim.P. Rule 29(a). Here, trial was to the court. Accordingly, the motion fully tested the sufficiency of the evidence under the proof beyond a reason-

able doubt mandate. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The motion was made by counsel for Leach at the close of the Government's case-in-chief. After it was denied, the defense rested.

■ In reviewing a challenge to the sufficiency of the evidence following conviction, we must view all of the evidence, both direct and circumstantial, and all reasonable inferences to be drawn therefrom, in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Massey*, 687 F.2d 1348 (10th Cir.1982); *United States v. Blitstein*, 626 F.2d 774 (10th Cir.1980), *cert. denied*, 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981). If substantial evidence supports the verdict, it cannot be set aside. *United States v. Themy*, 624 F.2d 963, 965 (10th Cir.1980). Here, the trial court, as the fact finder, observed the appearances and demeanor of the witnesses, appraised their credibility, determined the weight to be given their testimony, drew permissible inferences therefrom, resolved any conflicts in the evidence and reached the ultimate conclusions of fact. Those are functions exclusively reserved to the trier of fact. *United States v. Waldron*, 568 F.2d 185, 187 (10th Cir.1977), *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978).

■ Briefly, the trial court had before it this evidence which is undisputed in the record: the appellant's oral and typewritten admissions of the offenses charged at the sites named on the dates alleged; knowledge by Leach that the $100.00 notes were in fact counterfeit; proof of Leach's presence in the Tulsa area on the dates in question in possession of a vehicle loaned to him by Mr. Humphrey and identified by make, license number and vehicle description by Mr. Saas, manager of Wendy's, who was handed one of the $100.00 counterfeit note by a man operating that vehicle; and the various counterfeit notes described by appellant Leach in his admissions as having been passed by him at other business sites

in Tulsa which were in fact actually passed at those business sites. There was other credible, convincing evidence. Taken as a whole, we are satisfied that a rational trier of fact could have found Leach guilty of the crimes for which he was convicted beyond a reasonable doubt. *Jackson v. Virginia, supra.*

WE AFFIRM.

### GOVERNMENT'S EXHIBIT 8

### STATEMENT

STATE OF ___Oklahoma___ )

COUNTY OF ___Muskogee___ ) ss.

CITY OF ___Muskogee___ )

I, ___Terry Don Leach___, being first duly sworn, according to law, depose and say:

I was born ___1/19/60___, at ___Muskogee, Okla.___, and I live at ___1616 Aberdeen St., Muskogee, Okla.___. On this ___2___ day of ___November___, 1982, in ___Muskogee___, Oklahoma, I have been questioned by Special Agent ___Donald R. Newsom___, United States Secret Service, who identified himself by means of a commission book. I understand that any statement may be used in court. I am willing to speak with Special Agent ___Donald R. Newsome___, about the following matter:

On or about 24 Sept. 1982, I met my Cousin, Ricky Dale Barron, in his car, 1980 Chev Impala 2dr Bronze, in Muskogee, Okla. He showed me a lot of $100.00 Bills that he said was counterfeit money from Joe Fairchild and that Fairchild could get him all that he wanted.

About 1 week later, I was in Checotah, Okla. at a rodeo match and ___Joe Fairchild___ came up to me and asked if I wanted to buy some of the counterfeit money. I told him yes and he showed me what I believed to be $4,000.00 worth of the counterfeit $100.00 bills for $500.00 genuine money.

I kept the money for about 10 days and then went to the Quality Inn at Kirt's Mall located at York St. and the Shawnee By-Pass in Muskogee, Okla. and got change for one of the counterfeit $100.00 bills. Ricky Barron was with me at the Quality Inn at that time and he may have passed one of the notes at the bar.

About 10 days later, I was in Tulsa (Approx. 10/14/82), Okla. and passed Counterfeit $100.00 bills at the following places during one day that night and the next day:

1. Gas Station around 41st. & Garnett
2. " " " 21st. & Garnett
3. Skaggs Alpha Beta around 51st. & Memorial
4. Burger King 11 St. & Howard
5. Taco Mayo around 51st. & Sheridan
6. Braum's Ice Cream around 51st. & Lewis
7. Wendy's Hamburger around 51st. & Lewis
8. Picadilly's Cafeteria Southroads Mall
9. Hastings Records Southroads Mall

I also gave one of the notes to a friend, Mark Phelps, in Tulsa, Okla. and I will get that note back.

My wife Zana Leach was with me during the pass I made at Skaggs but she didn't know what was going on.

About 1 or 2 days after I passed the last note, I saw Ricky Barron while I was in Warner, Okla. and he asked me if I "got my money" indicating or inquiring if I passed all the notes. I told him I had and he said that there would be no more. Rick was broke at the time so therefore, I don't believe that he had anymore at the time.

I have not seen Joe Fairchild since I bought the notes from him.

I am willing to testify to everything in this statement, if I have to.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

s/TERRY DON LEACH
November 2, 1982

I have read and understand the above statement of __1__ pages. I have been given an opportunity to make corrections or changes. This statement is true and correct to the best of my knowledge.

SWORN AND SUB-    s/TERRY DON LEACH
SCRIBED TO THIS _2_    Affiant
day of __November__, 1982.

s/DONALD R. NEWSOM    s/THOMAS M. DADE
Special Agent, U.S. Se-    Witness
cret Service (Auth. to ad-
min. oath: 5 USC 93)