Jane Ellen BLACK, Appellant
(Defendant),

v.

STATE of Wyoming, Appellee (Plaintiff).

No. 90–128.

Supreme Court of Wyoming.

Nov. 18, 1991.

Rehearing Denied Dec. 18, 1991.

Walter A. Murray, Jr., Casper, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., Theodore E. Lauer, Director of the Prosecution Assistance Program, and E. Daniel Farrar, Student Intern for the Prosecution Assistance Program, for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY, and GOLDEN, JJ.

## OPINION

MACY, Justice.

Appellant Jane Black appeals her conviction for delivery of a controlled substance (methamphetamine).

We reverse and remand.

Appellant raises the following issues:

### I.

Whether or not the trial court erred by denying Appellant[']s [M]otion To Dismiss For Denial Of Speedy Arrest And Due Process.

### II.

Whether or not the trial court erred in not granting the Appellant[']s Motion To Dismiss Information on the grounds that Appellant was denied her right to a fair preliminary hear[ing] and confrontation at the preliminary hearing stage of the criminal process.

### III.

Whether or not the trial court erred in failing to suppress Defendant[']s statements and evidence derived therefrom.

According to the criminal complaint made on November 7, 1989, Appellant delivered a controlled substance, methamphetamine, to Paula Pirman "on or about the 20th or 21st day of January, 1989," in Gillette, Wyoming. The complainant, an agent with the Northeast Wyoming Drug Enforcement Team, stated that Pirman told an officer of the Gillette police department that she had purchased one-quarter gram of methamphetamine from Appellant on January 20, 1989, for $25.[1] The agent also detailed an "interview" with Appellant, which he and another detective conducted at the Gillette police department on March 16, 1989. During this interview, Appellant admitted making the delivery. The relevant dates are January 20, 1989, Appellant made delivery; March 16, 1989, Appellant was interviewed by officers and confessed

to delivery; and November 7, 1989, criminal complaint was made, and criminal warrant was issued for Appellant's arrest.

■ Appellant claims she has a right to a speedy arrest. She premises her speedy arrest claim upon the accused's right to a speedy trial found in the sixth amendment to the United States Constitution and in article 1, section 10 of the Wyoming Constitution. Neither the United States Constitution nor the Wyoming Constitution, however, uses the term "speedy arrest." Both provisions use the term "speedy trial" instead. Appellant maintains that, shortly after the delivery on January 20th, the police had all the evidence they needed to charge her with that crime and that, therefore, the police should not have delayed her arrest until November 7th. We addressed a claim of speedy arrest in *Hovee v. State*, 596 P.2d 1127, 1130 (Wyo.1979), and stated:

> [A] claim, based solely on pre-arrest and pre-indictment delay, does not raise any question under the speedy trial provision of either the Sixth Amendment of the United States Constitution or Art. 1, § 10, of the Wyoming Constitution....

The United States Supreme Court

> considered the significance, for constitutional purposes, of a lengthy preindictment delay [and] held that as far as the Speedy Trial Clause of the Sixth Amendment is concerned, such delay is wholly irrelevant, since our analysis of the language, history, and purposes of the Clause persuaded us that only "a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge ... engage the particular protections" of that provision.

*United States v. Lovasco*, 431 U.S. 783, 788–89, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (quoting *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). The speedy trial clause has no application to prearrest delay.

---

**1.** Pirman also gave the officer the substance she purchased from Appellant. A test of the sub-

stance revealed it was methamphetamine.

■ Appellant also claims the delay violated her rights to due process and a fair trial.[2] In *Story v. State,* 721 P.2d 1020, 1028, 65 A.L.R.4th 1011 (Wyo.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 405 (1986), we stated that a defendant is denied due process where "the prosecutor delays filing charges to gain a tactical advantage, perhaps where the prosecutor acts in bad faith in delaying the filing of charges, *and* where substantial prejudice results from the delay." (Emphasis in original.) Appellant admits, "Although there was no direct testimony that the State was intentionally delaying the arrest and prosecution of the Appellant, the implication is there." An "implication" that an intentional delay existed is not enough; some evidence must be in the record to support the charge. Appellant also argues that she "suffered greatly from this delay" because the individual who actually delivered the drugs died before she was charged. Appellant has not demonstrated the prejudice caused by the death of the witness; i.e., why her defense was impaired. The record also does not disclose when this particular witness died. Without these showings, it is impossible to determine whether she suffered "substantial prejudice" from the delay. *Id.*

Appellant asserts that the statements she made during the interrogation on March 16, 1989, were not voluntary and that, therefore, they should have been suppressed. She also cites Wyo.Stat. § 7–6–105(a) (1987) to support her argument that her statements should have been suppressed. This particular statute is part of the "Public Defender Act" and requires, "A needy person who is being interrogated by law enforcement personnel for a serious crime ... shall be informed of his right to be represented by an attorney at public expense." Because Appellant's interrogation was counter to the principles of due process, we do not address her separate statutory claim. We have previously stated, "In determining whether statements

made by an accused are voluntary, the totality of the circumstances surrounding the interrogation must be examined." *Frias v. State,* 722 P.2d 135, 141 (Wyo.1986).

■ In *Frias,* the issue was whether the defendant had voluntarily waived his *Miranda* rights. We ruled, *inter alia,* that the defendant's statements were the product of police coercion and were not made voluntarily. *Id.* at 142–43. We note that at no point during the interrogation was Appellant ever advised of her rights under *Miranda,* and that, even though fifth amendment and *Miranda* violations were not implicated here because Appellant was not in custody at the time of the interrogation as Appellant was told she was free to leave at any time, "the due process clause still stands as [an] independent limitation on the use of a defendant's pretrial statement." 2 D. Rudstein, C. Erlinder, & D. Thomas, Criminal Constitutional Law § 4.01[1] at 4–5 (1990). We, therefore, review Appellant's claim under article 1, section 6 of the Wyoming Constitution: "No person shall be deprived of life, liberty or property without due process of law."

■ The agent testified that, at the time he questioned Appellant on March 16, 1989, he knew Pirman had already identified Appellant as being the one who had sold her the methamphetamine. The agent also testified that he had questioned another witness who admitted she had sold methamphetamine to Appellant and her husband. After Appellant arrived at the police station, the two police officers interrogated her for two hours. During this time, she was asked specific questions about her involvement in the methamphetamine delivery of January 20, 1989. Appellant was told that "she could be charged with delivery of methamphetamine and possibly conspiracy to deliver methamphetamine." The agent testified that Appellant, who, he noted, was "[e]xtremely pregnant," was "upset" and "crying" during the interrogation. The police interrogated an individual whom they had already identified as being the

---

**2.** *See* the fifth and fourteenth amendments to the United States Constitution and article 1,

section 6 of the Wyoming Constitution.

principal suspect, and, even though that individual was upset and crying because she was concerned about being charged with a serious crime during her pregnancy, the police continued to interrogate her for two hours.[3]

Other circumstances also reveal police coercion: The previous night, March 15, 1989, the police went to Appellant's house and asked her husband to come to the police station and discuss an "ongoing investigation." After Appellant's husband arrived at the station, he was interrogated for four and one-half hours. During the interrogation, the police told Appellant's husband that they knew about his involvement in the distribution of methamphetamine. He was also told that the police knew about Appellant's January 20, 1989, delivery of methamphetamine. Appellant's husband made a "substantial statement" that night and agreed to "cooperate" with the police in their ongoing investigation. He also agreed to bring Appellant to the police station the following morning, and the police agreed to "try and clear up the— both of their involvement." At the time Appellant was interrogated, she was aware that her husband had agreed to cooperate with the police, that the police suspected her for the delivery of methamphetamine, and that the police wanted to question her about both matters.

There is a line which the police may not cross in pursuing their investigation of a crime. That line is drawn by the due process clause of the Wyoming Constitution. We are free to grant more rights to our citizens under the Wyoming Constitution than they are entitled to have under the United States Constitution. *See Washakie County School District Number One v. Herschler*, 606 P.2d 310 (Wyo.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980). Due process does not prohibit the police from questioning Appellant about her possible involvement in a crime. Coercive interrogation of Appellant, however, does not comport with this state's notions of due process. The circumstances

reveal that the police had made the case against Appellant at the time of the interrogation and that they were simply fishing for a confession. Due process does not permit the police to coerce an individual into knotting her own noose.

Our review of the totality of the circumstances surrounding Appellant's interrogation reveals police coercion. We hold that Appellant's statements were not made voluntarily and that, therefore, those statements were not admissible evidence. *See Frias*, 722 P.2d 135. We note that suppression of Appellant's statements will also deter future police coercion of individuals.

The finding of probable cause at the preliminary hearing was determined, in large part, upon Appellant's confession. If the State chooses to pursue this case, Appellant is entitled to another preliminary hearing. Accordingly, we do not address the claims raised by Appellant in her second issue. If there is a second preliminary hearing, the State may not, in any manner, make use of Appellant's coerced confession.

Reversed and remanded for proceedings in accord with this opinion.

CARDINE, J., concurring.

THOMAS, J., dissenting.

GOLDEN, J., dissenting, with THOMAS, J., joining.

CARDINE, Justice, concurring.

I concur in the opinion of this court and write separately to say some things about this case that need saying.

After a "disinterested, objective examination of the totality of the circumstances," the dissent arrives at the rather remarkable conclusion that the "policemen genuinely comforted Mrs. Black." It is difficult to picture how a two-hour interrogation of a crying, pregnant lady in the police interrogation room—during which she is told she may face two felony charges—could even remotely be considered comforting.

---

**3.** In *Frias*, we also considered the circumstances personal to the defendant, an illegal alien from Mexico, when we analyzed whether the police interrogation was coercive.

The role of the courts is to ensure that an individual's right to remain silent offers true protection to that individual. It is therefore dangerous for courts to end their inquiry into whether an individual's statements are truly voluntary once they have located the magic phrase "you do not have to answer any question and you are free to leave." Coercion does not always come in such easy to spot packages as racks and whips. All too often it comes in the more subtle forms of an individual placed in jeopardy and told to make a crucial decision without the benefit of an attorney.

Now let us look at what really happened in this case. Mrs. Black's husband was interrogated over a substantial period of time the night before her own interrogation. Mr. Black agreed to help with an ongoing investigation in Billings, Montana, and, as the interrogating officer stated:

"A. He cooperated to a great extent. He traveled with myself and Special Agent [ ] to Billings, Montana. Made some contacts with people in the Billings area, including the dispatcher up there, and also cooperated later in court proceedings against her.

"Q. And when was that finished, the Billings' incident?

"A. The trial?

"Q. Yes.

    *     *     *     *     *     *

"A. I can't be sure of that.

"Q. But it was just before these charges were filed against Mrs. Black; is that correct?

"A. I'm not sure of the exact date, but I believe the complaint against Mrs. Black was signed after the completion of the court case in Billings."

At this point, it is apparent that Mr. Black's cooperation was ensured by bringing his wife in, threatening her with criminal charges, but holding out the carrot of maybe no charges being filed if he cooperated. He did help the officers. They made the Billings case, and as soon as it was concluded, felony criminal charges were filed and prosecuted against Mrs. Black. Keep in mind Mrs. Black was a working mother waitress with three small children who was given $25 by a friend and used the $25 to purchase a small quantity of methamphetamine which was given to the friend. She had no prior criminal record of any kind. Now she has a felony record resulting, among other things, in loss of her rights of citizenship.

What she did, to be sure, was a crime. What she received for her cooperation was nothing. It is true the State must prosecute crime. But it is also true that in carrying out the many, varied and very great duties of the office, the prosecutor is vested with prosecutorial discretion in filing charges, recommending nolle prosequi, immunity, and some prosecutors make use of administrative probation within their office. All would avoid a felony record for this lady. That again is a matter for the discretion of the prosecutor—not exercised here—and one must wonder if she was fairly treated by the system.

Ultimately, the issue of whether there was coercion turns on the individual jurist's notions of what is fair and what is permissible police conduct. Here, I am satisfied that there were sufficient circumstances to find coercion and, therefore, concur in the opinion of the court.

THOMAS, Justice, dissenting.

I, too, dissent from the disposition of this case, and I join in the able, logical, and clear dissent of Justice Golden. One must grudgingly admire the creative effort of the majority and concurring opinions to justify and excuse the conduct of Jane Ellen Black and to castigate the law enforcement officers who were responsible for pursuing the investigation which led to her conviction. In my opinion, anyone who sells controlled substances of any nature is marketing death! It is remarkable to suggest that someone who has been convicted of a felony because she sold drugs has not been treated fairly by the system. There can't be any question about Black having been treated fairly by the system.

A more accurate perspective would certainly include the fact that the husband of Black's customer collapsed after using the

methamphetamine that Black supplied. That is a slightly different scenario from the claim in the concurring opinion that Black "was a working mother waitress with three small children who was given $25 by a friend and used the $25 to purchase a small quantity of methamphetamine which was given to the friend." at 970. Assuredly, it would be naive to assume that this was the only instance in which Black had participated as a purveyor of controlled substances. The customer's husband could have died, as others have after using illegal drugs. I would assume that then the friend would have been "upset and crying."

For me, the clear fallacy in the disposition of this case is that the pertinent constitutional provisions are ignored. The issue of voluntariness with respect to admissions or confessions until today has been addressed under the provisions of Article 1, Section 11, of the Constitution of the State of Wyoming and the Fifth Amendment to the Constitution of the United States that protect the individual from being compelled to testify or be a witness against himself in any criminal proceeding. I perceive it to be a confession on the part of the majority that the traditional authority in the area cannot be invoked to justify the result that is reached. That is why the shift is made to the due process clause found in Article 1, Section 6, of the Constitution of the State of Wyoming, and the thrust of that provision is applied to grant Black more rights under the Wyoming Constitution than she would enjoy under the Constitution of the United States. Indeed, she has been granted broader rights than she would enjoy anywhere else in the world. That is demonstrated by the failure to invoke any authority from any jurisdiction other than the citation to *Frias v. State*, 722 P.2d 135 (Wyo.1986), which clearly is distinguishable from this case.

I do have a sincere concern about the omniscience that the majority manifests by its decision. The trial court ruled as a matter of fact that Black's confession was voluntary. That judge saw the witnesses and heard the testimony. Our rule for appellate review is that we view the evi-

dence in a light most favorable to the prevailing party when reviewing an issue of fact such as this. *Wilde v. State*, 706 P.2d 251 (Wyo.1985). We do not redecide factual issues so long as they are supported by evidence in the record. In fact, we depart from our proper role as a reviewing court when we substitute our views on a question of fact for those of the trial court.

In this instance, the trial judge's ruling was supported by substantial evidence. Yet, this court feels free, having heard no testimony and without ever having seen the witnesses who testified on the issue, to conclude that the questioning of Black was coercive. A speculation that the fact that Black was "upset and crying" because her misdeeds had been discovered and she would have to face the consequences is equally valid. Or, perhaps Black was trying to con the law enforcement officers as she has this court. The conclusion of the majority can only be reached by reweighing the evidence that the trial judge received. When we invoke subjective factors to reach our own conclusion as to the question of duress or coercion, superarrogation again becomes manifest. I submit that the majority is wrong. This decision not only is bad law, but it is bad jurisprudence.

Because I disagree with the majority about the voluntariness of the confession, it is appropriate to address Black's claim that she was entitled to have her statement suppressed because of the provisions of Section 7–6–105(a), W.S.1977 (June 1987 Repl.), providing that:

"A needy person who is being interrogated by law enforcement personnel for a serious crime, ... shall be informed of his right to be represented by an attorney at public expense. If the person being interrogated does not have an attorney and wishes to have the services of an attorney, he shall be provided the opportunity to contact the nearest public defender."

The State correctly points out that, read in context of the other statutes that were in effect when Black committed the crime, the context was that of being formally charged or being detained by a law enforcement

officer for a serious crime. Those factors were not operative in this situation and, therefore, Black's statement did not come within the provisions of this statute so as to justify its suppression.

It appears that the rule of law to be derived from this case is that law enforcement officers should not question a pregnant subject, particularly if she cries or becomes upset, because the statement will be suppressed as a matter of law. When so summarized, it hardly seems to possess either reason or logic. Instead, it becomes clear that the case has been used by the court only for the purpose of criticizing the work of law enforcement officers. Probably, those officers won't work so diligently in the future to interfere with unlawful trafficking in drugs. At least they will let pregnant women sell those drugs as much as they want.

GOLDEN, Justice, dissenting, with whom THOMAS, Justice, joins.

I disagree with this court's holding. A two-hour police interrogation in her husband's presence of a seven-months pregnant woman, whom the police had already identified as the principal suspect and who was at times upset and crying because of concern for being charged with a serious crime during her pregnancy, did not constitute coercion, rendering involuntary her inculpatory statements to police. Therefore, I respectfully dissent.

Several aspects of the majority's opinion trouble me. One is the majority's unexplained and total disregard for the trial court's findings of historical fact which frame the voluntariness issue. The trial court conducted a *Jackson–Denno* hearing[1] before trial at which four witnesses testified, the three police officers who were present during the interrogation and Mrs.

Black's husband who was present with her at all times during the questioning. Mrs. Black chose not to testify. After hearing the testimony about the facts and circumstances surrounding the interrogation and the personal characteristics of Mrs. Black, the trial court had no difficulty determining that Mrs. Black's inculpatory statements to police were not the product of coercion. Those facts and circumstances and personal characteristics are laid on the record. Under our appellate standards of review, we are bound to view them in the light most favorable to the state as the prevailing party.[2] The majority has violated that appellate standard.

Another aspect of the majority's opinion that troubles me is the majority's failure to examine in fact the *totality* of the circumstances attending the interrogation. Indeed, without citation to any supporting legal authority, the majority identifies as a major factor in its *ratio decidendi* the police officers' pre-interrogation focus on Mrs. Black as a prime suspect. That the police focused on her or "had the case made" against her before they initiated questioning is of no significance under the voluntariness jurisprudence I have studied.[3]

Equally troubling for me is the majority's abject failure to link Mrs. Black's emotional state (periodically upset and crying)[4] to anything the police said or did during the questioning. As explained in *Colorado v. Connelly*, 479 U.S. 157, 165, 107 S.Ct. 515, 520–21, 93 L.Ed.2d 473, 483 (1986), a court looks for "the essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." Justice Frankfurter expressed the concept in this way:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to

---

1. *Ramos v. State*, 806 P.2d 822, 829 (Wyo.1991).

2. This court has said "the prosecution must convince the trial court at least by a preponderance of evidence that the confession was voluntary." *Dodge v. State*, 562 P.2d 303, 308 (Wyo.1977). *See also United States v. Chalan*, 812 F.2d 1302, 1307–08 (10th Cir.1987).

3. *See, e.g., United States v. Leach*, 749 F.2d 592, 599–600 (10th Cir.1984).

4. Mere emotionalism and confusion do not necessarily invalidate a statement or confession. *Corn v. Zant*, 708 F.2d 549, 567 (11th Cir.1983) (citing *Sullivan v. Alabama*, 666 F.2d 478, 483 (11th Cir.1982)).

confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057–58 (1961).

A disinterested, objective examination of the totality of the circumstances, including Mrs. Black's personal characteristics, readily and with unmistakable clarity shows that the police did not by word or deed coerce Mrs. Black to answer their questions and make her statements. At the outset of this examination, let us state that which is not involved here. The police used no lash, no rack on Mrs. Black. She makes no allegations of physical coercion. Unlike what the police did to Martin Frias, as reported in *Frias v. State,* 722 P.2d 135, 143 (Wyo.1986),[5] the police here did not confront Mrs. Black with "a barrage of accusations and threats"; they did not repeatedly accuse her of lying; and they did not threaten her with the loss of her children and incarceration in the women's prison unless she changed her story. Unlike *Frias,* the police here did not tell appellant they had evidence which they really did not have. Mrs. Black makes no allegation that any policeman ever even raised his voice against her. To the contrary, the undisputed evidence is that the policemen genuinely comforted Mrs. Black and told her that charges against her would likely be filed only after she had delivered her child. And, that was truly what happened.

Tellingly, the majority ignores examining the only allegation made by Mrs. Black in support of her effort to suppress her inculpatory statements, namely, that the police told both Mr. and Mrs. Black that it would probably go easier for them to cooperate because the police would report that cooperation to the prosecuting attorney. The trial court made appropriate short-shrift of that allegation, as would I, since under the withering fire of nearly every case, state or federal, on the point such a statement by police has been universally declared innocuous and constitutionally acceptable.[6]

My examination of the record, including the transcript of the *Jackson–Denno* hearing, reveals the following undisputed historical facts that we, as an appellate court, must accept as true:

1. When questioning Mr. Black the night before the day on which Mrs. Black was questioned, the police *asked,* and did not order, him if he would return the next morning and bring his wife.

2. Mr. and Mrs. Black voluntarily came to the police station around 9:00 a.m. the next day.

3. Mrs. Black was about seven months pregnant; was the mother of two young children; helped her husband run a tree and lawn care business in which she was the bookkeeper; had graduated from high school; was in her early thirties; and had no known physical or mental impairments.

4. Mr. Black remained with Mrs. Black at all times.

5. The police told them they did not have to answer any questions if they did not want to.

6. The police told them they were not under arrest and could leave at any time.

7. The police and the Blacks were seated in a meeting or debriefing room with windows, carpet on the floor, a table and a telephone.

8. The questioning was of about two hours duration.

---

5. Contrary to the majority's statement in footnote 5, this court in *Frias* did *not* rule that Frias' statements were the product of police coercion and, thus, were not made voluntarily. Rather, this court held that his statements were inadmissible because the trial court failed to expressly find that his statements were voluntary. *Frias,* 722 P.2d at 143.

6. *See, e.g., United States v. Leon Guerrero,* 847 F.2d 1363, 1366–67 (9th Cir.1988) and cases cited therein; *Hawkins v. Lynaugh,* 844 F.2d 1132, 1139–41 (5th Cir.1988); *United States v. Pelton,* 835 F.2d 1067, 1072–73 (4th Cir.1988) and cases cited therein; *United States v. Guarno,* 819 F.2d 28, 31 (2nd Cir.1987); *Beasley v. United States,* 512 A.2d 1007, 1015–16 (D.C.App.1986); *State v. Robertson,* 219 Neb. 782, 366 N.W.2d 429, 433 (1985) and cases cited therein.

9. The Blacks were cooperative and spoke freely, never indicating they did not want to answer a question asked.

10. At times during the questioning, Mrs. Black cried, but she was not crying the entire time.

11. When the questioning was concluded, the Blacks left the police station the way they had arrived, in their own car without police involvement.

There is no evidence here that Mrs. Black's free will was overborne by the police questioning. In sum, I agree with the trial court that Mrs. Black's answers and statements were freely given. In this regard, I recall the words of Justice Guthrie writing for the court in *Lonquest v. State*, 495 P.2d 575, 580 (Wyo.1972): "This may have been the result of compulsions but ones that originated within this defendant and not from any outside source."

Finally, I am troubled by the total absence of state constitutional analysis in a majority opinion expressly driven by the due process clause of the Wyoming Constitution.[7] The majority boldly declares that the police in their questioning of Mrs. Black crossed the line drawn by that due process clause. Declaring it is one thing, demonstrating it, quite another. The majority fails to demonstrate coercive interrogation of Mrs. Black by the police.

The majority declares[8] the cherished principle of federalism that a state constitutional provision may be more protective of citizens' rights than its counterpart in the Federal charter. Declaring that our state's due process clause is more protective of Mrs. Black's rights against police questioning than the due process clause of the United States Constitution is one thing. Demonstrating it, quite another. The majority fails to demonstrate why the state's due process clause is more protective than its federal counterpart. Saying it is so, does not make it so. It must be proved by appropriate jurisprudential technique, both principled and analytic in nature. In most instances, if not all, state constitutional analysis is an arduous undertaking. Here, regrettably, the majority has not even broken a sweat. The majority employs the "it-is-so-because-I-say-it-is-so" analytical technique. That is not appropriately principled analytic jurisprudence; that is only the unattractive exercise of raw power.

---

7. "No person shall be deprived of life, liberty or property without due process." Wyo. Const. art. 1, § 6.

