2010 WY 136

**Jeffery Lee CARTER, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–09–0181.**

Supreme Court of Wyoming.

Oct. 14, 2010.

Representing Appellant: Michael H. Reese, Contract Appellate Counsel, of Michael Henry Reese, P.C., Cheyenne, Wyoming.

* Chief Justice at time of oral argument.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Jenny L. Craig, Assistant Attorney General. Argument by Ms. Craig.

Before KITE, C.J., and GOLDEN, HILL, VOIGT *, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] Jeffery Lee Carter (Carter) was tried by a jury and convicted of the second-degree murder of Johnny Shane Moody (Moody). Carter appeals from the Judgment and Sentence, arguing prosecutorial misconduct and ineffective assistance of trial counsel. Finding no prejudicial error, we affirm.

## ISSUES

[¶ 2] 1. Did the prosecutor commit misconduct by referring to Carter as the "black guy" and Moody as the "white guy?"

2. Was trial counsel ineffective?

## FACTS

[¶ 3] During an argument that turned into a physical altercation, Carter stabbed Moody, killing him. Carter was arrested for, charged with, and eventually convicted of second-degree murder. He was subsequently sentenced to incarceration for not less than thirty-five years, nor more than forty-five years, with credit for time served. Carter appeals from the Judgment and Sentence arguing prosecutorial misconduct and several instances of ineffective assistance of trial counsel. Finding no prosecutorial misconduct or ineffective assistance of trial counsel, we affirm.

## DISCUSSION

***Did the prosecutor commit misconduct by referring to Carter as the "black guy" and Moody as the "white guy"?***

[¶ 4] Carter claims that the prosecutor committed misconduct by repeatedly referring during the trial to him as the "black guy" and to Moody as the "white

guy." Carter further claims that these comments deprived him of a fair trial and an impartial jury guaranteed to him by principles of due process and the Sixth Amendment to the United States Constitution as applied to the states through application of the Fourteenth Amendment to the United States Constitution. Regarding claims of prosecutorial misconduct, we have said the following:

> Claims of prosecutorial misconduct are settled in reference to the entire record and hinge on whether a defendant's case has been so prejudiced that the defendant did not have a fair trial. *Arevalo v. State*, 939 P.2d 228, 230 (Wyo.1997). The propriety of a closing argument is considered in the context of the entire argument. *Id.* Reversal is warranted when a reasonable possibility exists that, absent the error, the appellant may have enjoyed a more favorable verdict. *Id.*

*Campbell v. State*, 999 P.2d 649, 663 (Wyo. 2000). No objection was made at trial to the alleged improper comments by the prosecutor, so we apply a plain error analysis. *Id.* Accordingly, in order for Carter to prevail on appeal, he must demonstrate

> that the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right. Reversal of a conviction on the basis of prosecutorial misconduct, which was not challenged in the trial court, is appropriate only when there is a substantial risk of miscarriage of justice.

*Burton v. State*, 2002 WY 71, ¶ 13, 46 P.3d 309, 314 (Wyo.2002) (internal quotations and citations omitted).

[¶ 5] As support for his contention that the prosecutor committed misconduct, Carter points to numerous times throughout the trial in which the prosecutor and witnesses made reference to him as the "black guy" and Moody as the "white guy." On appeal, the State does not contest the fact that the record clearly reflects the prosecutor's repeated use of the phrases "black guy" and "white guy" throughout the trial.

[¶ 6] Having satisfied the first prong of the plain error test—that the record clearly reflects the alleged error—we turn to the second prong to determine whether the alleged error violated a clear and unequivocal rule of law. Carter points to numerous cases to support his contention that the prosecutor, by referring to him as the "black guy" and Moody as the "white guy," violated a clear and unequivocal rule of law prohibiting such comments. The consistent theme throughout the cases cited by Carter, and others dealing with this particular issue, is the desire to remove illegitimate references to race from judicial proceedings to the fullest extent possible. *See State v. Garrett*, 42 Conn.App. 507, 681 A.2d 362, 367–68 (1996) (prosecutor's comment in closing argument telling the jury not to let the defendant hide behind his "blackness," which was in response to defendant claiming he was being prosecuted for being black, was error, but not prejudicial); *Reynolds v. State*, 580 So.2d 254, 255–57 (Fla.Dist.Ct.App. 1st Dist.1991) (In a sexual battery case involving black defendant and white victim, prosecutor's comments, such as asking jury to think about "how embarrassing it is for an 18–year old white girl from Crestview to admit she was raped by a black man," were held to have improperly injected race into the trial and violated defendant's right to fair trial.); *State v. Varner*, 643 N.W.2d 298, 302–05 (Minn.2002) (statement made by white juror to another juror regarding the area where crime was committed as being the "miracle mile" because it was a miracle if a white person could walk through that area without being beaten or robbed held improper and prejudicial); and *Clark v. State*, 102 Miss. 768, 59 So. 887, 888 (1912) (denial of black defendant's request for instruction stating that "he is entitled to be tried by the same rules of evidence and law as if he were a white man" upheld). We continue to recognize that core principle as a prerequisite to a fair trial, but we also follow the reasoning found in this Court's jurisprudence, and others, which recognize legitimate exceptions to the general principle that race should be excluded to the fullest extent possible. *See Campbell*, 999 P.2d at 663 (prosecutor's references to victim being mixed race and defendant's boyfriend being white were legitimate grounds for the use of race as it established motive for abuse of the child);

*State v. Hill,* 105 N.C.App. 489, 414 S.E.2d 73, 76–77 (1992) (Use of defendant's and victim's skin color as a means of identification was not error and "did not cause the issue of race to improperly 'dominate the defendant's trial.'"); *Lee v. State,* 560 P.2d 226, 233 (Okla.Crim.App.1977) (prosecutor's request for witness to provide description of robbers and witness's response using their race as descriptions was "legitimate and proper").

[¶ 7] Turning to the present case, we find that the best way to demonstrate how the phrases "white guy" and "black guy" were used throughout the trial is to provide samples of testimony. For brevity's sake, we are not quoting every portion of the record that contains those phrases, but we have reviewed the entire record and determined that the following samples are representative of the context and purpose for which the phrases were used throughout the remainder of the unquoted portions of the record. For instance, the following colloquy between the prosecutor and one of the witnesses, who did not know the names of Carter or Moody, shows that the witness described them based, in part, on race when asked to identify the parties involved in the fight. This colloquy demonstrates the prosecutor's attempts to use descriptive features that other witnesses relied on to identify Carter and Moody, such as the color of Carter's shirt and the fact that Moody was not wearing a shirt, in order to make all of the witnesses' testimony consistent and clear to the jury.

Q. Okay. How many people were down by the trash cans?

A. There was [sic] two, maybe three people.

Q. Okay. What were they doing?

A. Arguing.

Q. Okay. Describe the people that are arguing for me. What do they look like?

A. One person was black; the other person was a heavy-set white person.

Q. Okay. The—the white guy, does he have a shirt on?

A. No.

Q. Okay. The black guy, does he have a shirt on?

A. Yes.

Q. How would you describe that shirt?

A. I am sorry. I don't remember—

Q. Okay.

A. —what color.

Q. Do you remember describing it to the police as a tan shirt with a big stripe on it?

A. Yes.

[¶ 8] While some witnesses used race to identify Moody and Carter, several witnesses who testified, including people who witnessed the murder and police officers who were first on the scene, knew the names of Moody and Carter and could identify them without the need to mention their respective race. For example, when the State questioned a witness who knew both Carter and Moody, the prosecutor attempted to tie that witness's testimony to what previous witnesses had testified:

Q. Who were the—who were the individuals that were arguing as you witnessed that standing at the end of the balcony?

A. Jeff and John.

Q. Okay. Jeff meaning Mr. Carter?

A. Yes.

Q. And John meaning Mr. Moody?

A. Yes.

. . . .

Q. Okay. And then Renee comes into the picture; what does she do?

A. She starts hitting Moody.

Q. She starts hitting Mr. Moody?

A. Yeah.

Q. Okay. Now, did you notice … what kind of clothing that Mr. Moody was wearing at that time?

A. He didn't have no shirt on.

During yet another witness's testimony—a witness who knew Carter, but did not know Moody—the following exchange occurred between her and the prosecutor:

Q. Okay. And do you know—in the time that you lived here, did you ever become acquainted with the defendant, Jeff Carter?

A. Yes, sir.

Q. Okay. Can you just tell us how it was that you met Mr. Carter?

A. (No response.)

Q. Maybe I'll ask you this, it might help to clarify: How long have you known Mr. Carter?

A. Since May.

Q. May of this year?

A. Yes, Sir.

. . . .

Q. Okay. Now ... did you have occasion, also, to ever meet a man by the name of John Shane Moody?

A. No, sir.

Q. Did you ever have occasion to meet a man by the name of Shane?

A. No, sir.

Q. Okay. Do you recall an incident at all in a laundromat involving the defendant Jeff Carter and another man?

A. Yes, sir.

. . . .

Q. Okay. And you were there visiting another friend?

A. Yeah, I was just sitting there.

Q. Okay. And at some point, Mr. Carter showed up?

A. Yes, sir.

Q. Okay. Now, at some point did another gentleman show up?

A. Yes, sir.

Q. Okay. What happened when this other—how would you describe this other gentleman?

A. He was a white man to me at that time.

Q. Okay.

A. And he told—

Q. Did you know his name?

A. No, sir, at the time I didn't.

Q. Okay. He's a white man. Can you describe him for us, please?

A. He's about my height and had brown hair, and he didn't have a shirt on. He had some shorts, and he camed [sic] up and he approached Jeff. . . .

[¶ 9] We also find relevant the fact that Carter's trial counsel also used race as a means of description when questioning wit-

nesses unfamiliar with Carter or Moody's names. One such instance is as follows:

Q. Where was Mr. Carter when you saw—when you came out and looked down in the middle of the street?

A. He was standing on the left side of the gentleman in front of him.

Q. Okay. This left side of—

A. This side.

Q. Would be of the white guy with no shirt?

A. Yes.

. . . .

Q. Okay. And so there were—was it three individuals facing towards him?

A. Well, the gentleman that—or gentleman or female—I couldn't tell you if it was male or female standing behind the tree. I don't know where they were facing. But the two that I could clearly see was facing the white man.

[¶ 10] Although Carter is correct that there is an abundant use of the phrases "white guy" and "black guy" throughout the record, we cannot say that the use of those phrases was for anything other than the legitimate purpose of describing the actors involved, and such use was not intended to inflame the jury or prejudice Carter. Rather, the phrases were used as a means to describe the actors involved, including the defendant and victim. The race of the defendant and victim was obvious to the jury and the use of those phrases told them nothing they did not already know from their own courtroom observations. *See State v. Kirk*, 205 Kan. 681, 472 P.2d 237, 239, 240 (1970) (The prosecutor's question to witness as to whether witness knew "the young colored gentleman sitting at the table" was not a violation of defendant's substantive right to a fair trial as "[t]he jury was told nothing it did not already know from courtroom observation, and from evidence properly admitted."). Because we cannot say that the prosecutor's use of the phrases "black guy" and "white guy" as a means of describing the defendant and the victim violated any clear and unequivocal rule of law, Carter has failed to prove plain error.

[¶ 11] Carter also claims that it was error to admit into evidence and that he was prejudiced by the admission into evidence of his videotaped interrogation where the detectives make several references to the victim as the "white guy." Specifically, Carter takes exception to a portion of the video where one of the detectives, in the course of trying to get Carter to tell them what happened, offers the following possible explanation: "Some white guy that thought he was gonna get the better of you. Why don't you sit up here and talk to us." Carter did not object to this at trial and therefore we review this claim of error under plain error. Because the video clearly depicts the scene about which Carter complains, the first prong of plain error is satisfied. Regarding the second and third prongs of the plain error analysis—that the prosecutor violated a clear and unequivocal rule of law and that it adversely affected a substantial right—we note that this is not a situation where the prosecutor was interjecting race into the trial in an attempt to prejudice or disparage Carter, but rather these were comments made in the course of the detectives' investigation. One of the witnesses testified that he heard the defendant say, "You don't mess with a black man, he'll stick you or shoot you." Apparently, the detectives were following up on the possibility of race as a possible motive for the crime. Furthermore, this particular comment made up a small portion of the interrogation video and overall trial. *See Garrett*, 681 A.2d at 368 (Improper racial comments made by prosecutor did not warrant reversal because they "were restricted to a very brief segment of the state's entire closing argument .... and did not pervade the entire trial."). Additionally, the evidence of Carter's guilt was quite strong, especially considering the number of witnesses who testified to seeing Carter be the aggressor in the fight and then observing Carter stab Moody. Under these circumstances, we cannot say that playing that portion of the video was error, or that it violated Carter's substantial rights. Accordingly, Carter has failed to prove plain error.

### *Was trial counsel ineffective?*

[¶ 12] Carter alleges that his trial counsel was ineffective for three reasons: (1) failing to object to the "white guy" and "black guy" comments discussed above; (2) failing to file a motion to suppress Carter's statements made to the police and replayed to the jury; and (3) calling a defense witness who was impeached by the State. Regarding claims of ineffective assistance of trial counsel, we have said the following:

> An appellant claiming ineffective assistance of counsel must demonstrate on the record that: 1) counsel's performance was deficient and 2) prejudice resulted. *Hirsch v. State*, 2006 WY 66, ¶ 15, 135 P.3d 586, 594 (Wyo.2006), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, [2059], 80 L.Ed.2d 674 (1984). Both components of the ineffectiveness inquiry are mixed questions of law and fact. *Strickland*, 466 U.S. at 698, 104 S.Ct. [at 2070]. Our review, therefore, is *de novo*. *United States v. Owens*, 882 F.2d 1493, fn. 16 (10th Cir.1989).

> When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Hirsch*, ¶ 15, 135 P.3d at 593. We indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* Under the two-prong standard articulated in *Strickland*, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to render such assistance as would have been offered by a reasonably competent attorney and that counsel's deficiency prejudiced the defense of the case. *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*, quoting *Strickland*, 466 U.S. at 686, 104 S.Ct. [at 2064].

> The burden of proving that counsel was ineffective rests entirely on the appellant. *Martinez v. State*, 2006 WY 20, ¶ 23, 128

P.3d 652, 663 (Wyo.2006). The appellant must also demonstrate the existence of a reasonable probability that, absent the deficiency in counsel's performance, the result of the proceedings would have been different. *Id.* A failure to make the required showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim. *Id.* An ineffectiveness claim may be disposed of solely on the ground of lack of sufficient prejudice. *Id.* When ineffective assistance of counsel is alleged due to counsel's failure to file a suppression motion, prejudice to a defendant can only be shown where, had the motion been made, it would have been granted, and had the evidence been suppressed, only a limited amount of evidence remained to support a conviction. *Grissom v. State,* 2005 WY 132, ¶ 12, 121 P.3d 127, 132–33 (Wyo.2005).

*Dettloff v. State,* 2007 WY 29, ¶¶ 17–19, 152 P.3d 376, 382–83 (Wyo.2007).

## 1. Failing to object to the "white guy" and "black guy" comments

[¶ 13]   As noted above, we find no error in the use of the phrases "white guy" and "black guy" in the context in which they were used to describe the actors involved in this case.   Additionally, with regard to the comments made by the detectives on the interrogation video, even if that portion of the video was played in error, which we have not concluded, Carter has not proven that it prejudiced him to the extent that the outcome of the trial would have been different, given the remaining amount of evidence against him. Accordingly, Carter has failed to prove ineffective assistance of trial counsel.

## 2. Failing to file a motion to suppress

[¶ 14]   Carter claims that his trial counsel was ineffective for failing to file a motion to suppress the interrogation video, which was played for the jury.   Specifically, Carter argues that his statements were involuntary because the detectives who were interviewing him would not allow him to sleep, and Carter's trial counsel's failure to file a suppression motion, on that ground, constitutes ineffectiveness.

[¶ 15]   The first step in determining whether Carter's trial counsel was ineffective is to determine whether Carter's statements to detectives were involuntary. If they were voluntary, the motion would have been unsuccessful, and no prejudice resulted from the failure to bring the motion. *Dettloff,* 2007 WY 29, ¶¶ 17–19, 152 P.3d at 382–83 (If a suppression motion would have been brought, but denied, the defendant suffers no prejudice from the failure to bring such a motion.).   The law relating to voluntariness of statements in Wyoming was stated in *State v. Evans,* 944 P.2d 1120 (Wyo. 1997):

Confessions, admissions, and statements are constitutionally required to be voluntary by the Fifth and Fourteenth Amendment of the United States Constitution and by Art. 1, § 6 of the Wyoming Constitution. *Lego v. Twomey,* 404 U.S. 477, 478, 92 S.Ct. 619, 621, 30 L.Ed.2d 618 (1972); *Black v. State,* 820 P.2d 969, 971 (Wyo. 1991).   The voluntariness requirement has been a part of the United States Supreme Court's constitutional jurisprudence since its decision in *Bram v. United States,* 168 U.S. 532, 542, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897).   Additional constitutional requirements concerning voluntariness were imposed by the Court's decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), for custodial interrogations.

It is well established, however, that satisfying *Miranda* does not resolve the question of voluntariness.   A confession may be found involuntary because of the means used to obtain it. *Coyote v. United States,* 380 F.2d 305, 310 (10th Cir.1967), *cert. denied,* 389 U.S. 992, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967); *People v. Scott,* 198 Colo. 371, 600 P.2d 68, 69 (1979).   A confession which is the product of either mental or physical coercion by the government is untrustworthy and cannot be used for any purpose in the trial of the case.   In Wyoming, the State has the burden of proving by a preponderance of the evidence, under the totality of the circumstances, that a confession, admission, or statement was given voluntarily. *Garcia*

*v. State,* 777 P.2d 603, 606 (Wyo.1989); *Dodge v. State,* 562 P.2d 303, 308–09 (Wyo. 1977). Admission of an involuntary confession offends due process, whether or not the defendant was in custody when the confession was given. *Black,* 820 P.2d at 971....

....

Statements are made voluntarily if they are the product of a citizen's free and deliberate choice rather than of governmental intimidation, coercion, or deception. *Bravo [v. State],* 897 P.2d [1303,] 1305 [ (Wyo.1995) ]. "Involuntariness requires coercive state action, such as trickery, psychological pressure, or mistreatment." *Withrow v. Williams,* 507 U.S. 680, 708, 113 S.Ct. 1745, 1762, 123 L.Ed.2d 407 (1993) (O'Connor, J., concurring) (citing *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986)). We have held that voluntariness must proceed from the spontaneous suggestion of the citizen's own mind, free from the influence of any extraneous disturbing cause. *Maki v. State,* 18 Wyo. 481, 487, 112 P. 334, 335 (1911). In *State v. Jones,* 73 Wyo. 122, 276 P.2d 445 (Wyo.1954), we quoted from Wharton on Criminal Evidence that "even a slight inducement held out by such a person [in a position of authority] renders the confession involuntary." *Jones,* 73 Wyo. at 144, 276 P.2d at 455; *see also Brady v. United States,* 397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970) (similarly holding that even a slight inducement will render a statement involuntary). *Jones* quoted approvingly of a New Mexico decision:

> When direct or implied promises made by the person in authority are shown "the law cannot measure the force of the influence thereby produced; neither can the courts determine in what degree they affected the mind of the accused and to what extent they entered into his decision to confess. Hence, the rule is established that, ... confessions which are made [under such conditions] must be excluded."

*Jones,* 73 Wyo. at 141, 276 P.2d at 453 (quoting *State v. Dena,* 28 N.M. 479, 214 P. 583, 584 (1923)). Our later decisions summarize that a confession offends due process if the suspect's will was overborne by the police and the suspect's capacity for self-determination was seriously impaired. *Yung v. State,* 906 P.2d 1028, 1034 (Wyo. 1995). In Wyoming, coercive police tactics violate the due process clause of WYO. CONST. Art. 1, § 6 and statements elicited pursuant to these tactics may be suppressed. *Yung,* 906 P.2d at 1035. This Court has not yet decided whether coercion is a necessary predicate to finding that a confession is involuntary under our state constitution; however, coercive government activity is a necessary predicate to finding involuntariness within the due process clause of the Fourteenth Amendment. *Garcia,* 777 P.2d at 606. Once the evidence establishes state actor coercion, a court must consider the effect of that coercion on the defendant's choice to confess or make an admission or statement. *Id.* Unless the court finds that coercive conduct caused the defendant to speak, the court must find the statement to be voluntary and the statement is admissible. *Id.* We recognize that coercion can be mental as well as physical. *Id.* The use of tricks or factual misstatements in and of themselves does not render a confession involuntary. *Id.*

....

Relevant factors concerning the characteristics of the accused and the details of the interrogation include:

> whether the defendant was in custody or was free to leave and was aware of the situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the de-

fendant's mental and physical condition immediately prior to and during the interrogation, as well as educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*People v. Gennings,* 808 P.2d 839, 845 (Colo.1991); *see also Yung,* 906 P.2d at 1034; *Witt v. State,* 892 P.2d 132, 139–40 (Wyo.1995); *Vigil v. State,* 859 P.2d 659, 665 (Wyo.1993); *Dice v. State,* 825 P.2d 379, 386 (Wyo.1992); *Black,* 820 P.2d at 971–72; *Garcia,* 777 P.2d at 607; *Stone [v. State],* 745 P.2d [1344,] 1348 [ (Wyo.1987) ]; *Frias v. State,* 722 P.2d 135, 142 (Wyo. 1986).

*Evans,* 944 P.2d at 1124–26.

[¶ 16]   Carter claims that his statements were involuntary because he was sleep deprived and intoxicated at the time of the interrogation.[1]   Specifically, Carter points to numerous portions of the interrogation video in which he complains to the detectives that he is "tired" or that he just "wants to sleep" and another portion of the interrogation video in which Carter told the detectives that he had approximately a six pack of beer and a "pint" to drink that night.   We have recognized that sleep deprivation and intoxication are factors which can make a statement involuntary.   *See Burnett v. State,* 997 P.2d 1023, 1026 (Wyo.2000) (discussing the requirement that sleep deprivation must be used as a means of coercive state action in order for it to make a statement involuntary) (citing *People v. Valdez,* 969 P.2d 208, 213 (Colo.1998)); *Siler v. State,* 2005 WY 73, ¶ 25, 115 P.3d 14, 26 (Wyo.2005) (Evidence of intoxication by itself does not render a statement per se involuntary, but will do so if "the impairment [is] so great as to deprive an individual of a capacity to understand the meaning of his statements."); *Lonquest v. State,* 495 P.2d 575, 582 (Wyo.1972) (same).

[¶ 17]   In the above-cited *Burnett* case, the appellant raised a similar sleep-deprivation argument to that raised here.   In *Bur-*

nett, the appellant claimed that her trial counsel was ineffective because her counsel should have pursued a motion to suppress her statement, given to police, arguing that it was involuntary due to getting "very little sleep the night before she gave the statement, she had difficulty standing up to men, and she was wearing her nightgown when she was taken to the police station and interviewed." *Burnett,* 997 P.2d at 1026.   In upholding Burnett's statements as voluntarily given, we stated,

> Even if we were to assume, *arguendo,* that Burnett's claims regarding the circumstances of her statement were entirely true, there still was no basis for the suppression of her statement.   " 'Involuntariness requires coercive state action, such as trickery, psychological pressure, or mistreatment.' "   *State v. Evans,* 944 P.2d 1120, 1125 (Wyo.1997) (quoting *Withrow v. Williams,* 507 U.S. 680, 708, 113 S.Ct. 1745, [1762,] 123 L.Ed.2d 407 (1993) (O'Connor, J., concurring)).   Absent such coercive state action, we will not determine that a statement is involuntary.   *See People v. Valdez,* 969 P.2d 208, 213 (Colo.1998) ("Absent evidence that the officers deprived Valdez of food and rest as a means of physical punishment, the fact that Valdez happened to be hungry and tired does not support a conclusion that his statements were involuntary[.]").

*Id.* at 1026.   Carter attempts to distinguish *Burnett* from this case by stating that the Court in *Burnett* did not find any coercive state action, but in the current case

> the coercive state action is evident on the face of the exhibit, where Mr. Carter is repeatedly refused sleep and told that he will not be allowed to sleep until he answers the questions of the detectives.   This echoes the language of *Valdez,* quoted by this Court in *Burnett,* above, only here, there is evidence that Mr. Carter was "deprived ... of ... rest."

---

1.   Carter also makes a brief general argument that his statements were involuntary because of "deception by the officers during their interview" of him.   However, he does not elaborate on this argument and after reviewing the interrogation video we cannot find a logical basis for this argument.   Accordingly, we will not further discuss it.   *See Marshall v. State,* 2005 WY 164, ¶ 12, 125 P.3d 269, 274 (Wyo.2005) ("We have consistently stated that we will not consider claims devoid of cogent argument and citation to legal authority.").

[¶ 18] While it is true that Carter requested to be left alone so that he could sleep, the mere fact that the detectives continued to ask Carter for information is not dispositive of whether Carter's statements were voluntary. As noted above, numerous factors are considered under a totality of the circumstances test to make a voluntariness determination. *Evans*, 944 P.2d at 1126; *see supra* ¶ 15. Application of those factors to this particular situation supports the thesis that Carter's statements were voluntary. Carter was provided *Miranda* warnings prior to the interrogation; Carter acknowledged to detectives that he understood his rights; Carter is capable of reading and writing; Carter has a GED; Carter was 45 years old at the time of the interrogation; Carter is experienced in dealing with police having been arrested dozens of times in the past; no threats or promises were made by detectives; the interrogation was only just over an hour in length; Carter did not complain about sleep throughout the entire interrogation; sleep deprivation was not being used as a form of physical punishment; Carter was permitted to sleep for several hours from the time he was arrested, at 10:00 p.m., until the time the interrogation began, at approximately 4:30 a.m.; and Carter was not denied food or water—in fact, Carter was provided water at least twice upon request. Furthermore, a review of the interrogation video reveals that Carter was lucid and coherent throughout most of the interrogation. He seemed fully to understand what was going on and maintained his denial of involvement in the murder throughout the interrogation. Moreover, when we compare this case with other cases finding statements to be involuntary due to the totality of the circumstances, including sleep deprivation, it is evident that this case is factually much different than those cases, which compels our decision to uphold Carter's statements as voluntary. *See Greenwald v. Wisconsin*, 390 U.S. 519, 520–21, 88 S.Ct. 1152, 1153–54, 20 L.Ed.2d 77 (1968) (statement held involuntary where defendant requested counsel and was denied access, was not advised of his rights, was not provided food or necessary medication for high blood pressure for over thirteen hours, and defendant claimed he did not sleep from time he was arrested at 10:45 p.m. until he provided a confession at 11:30 a.m. the next day); *Clewis v. Texas*, 386 U.S. 707, 707–711, 87 S.Ct. 1338, 1339–41, 18 L.Ed.2d 423 (1967) (third confession by defendant involuntary because, although not denied food or sleep prior to confession, it could not be separated from facts of first two confessions where defendant was held in custody for 36 hours prior to being taken before a magistrate, had no contact with a lawyer, had little sleep or food, was administered several polygraphs, was driven on a 600 mile road trip, detained at least three different police stations, and appeared to be sick); and *Ashcraft v. Tennessee*, 322 U.S. 143, 153–55, 64 S.Ct. 921, 926, 88 L.Ed. 1192 (1944) (statements involuntary where, for 36 hours, defendant was held incommunicado, without sleep, and was questioned by numerous officers). Given the totality of the circumstances, and the cases cited herein, we cannot say that Carter's will was overborne due to lack of sleep, which would render his statements involuntary.

[¶ 19] Turning now to Carter's argument relating to intoxication, we have said

> Intoxication from alcohol does not per se establish involuntariness. *State v. Baker*, 4 Kan.App.2d 340, 606 P.2d 120, 123 (1980); and *State v. Tucker*, 32 Wash.App. 83, 645 P.2d 711, 713 (1982). Instead, for intoxication to render a confession involuntary, the impairment must be so great as to deprive an individual of a capacity to understand the meaning of his statements. *See Lee v. State*, Okla.Crim., 700 P.2d 1017, 1020 (1985). Even though a defendant appears intoxicated, the fact that he understood what he was doing, carried on a conversation and responded to questions will render the statements admissible. *State v. Curry*, 127 Ariz. 1, 617 P.2d 785, 787 (App.1980). The proper inquiry regarding intoxication is whether a confession cannot be said to be the product of rational intellect and free will because of extreme intoxication. *State v. Corona*, 60 Or.App. 500, 655 P.2d 216, 219–220 (1982). *Stone v. State*, 745 P.2d 1344, 1348 (Wyo. 1987). We have also stated:
>
> > "The general rule applicable to confessions obtained from persons under intox-

ication has been well stated to the effect that 'proof that the accused was intoxicated at the time he confessed his guilt of crime will not, without more, bar the reception of the confession in evidence. But if it is shown that the accused was intoxicated to the degree of mania, or of being unable to understand the meaning of his statements, then the confession is inadmissible.' ..."

....

*Lonquest v. State,* 495 P.2d 575, 582 (Wyo.[1972]), *cert. denied,* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972) (*quoting People v. Schompert,* 19 N.Y.2d 300, 279 N.Y.S.2d 515, 226 N.E.2d 305, 308, *cert. denied,* 389 U.S. 874, 88 S.Ct. 164, 19 L.Ed.2d 157 (1967)).

*Siler v. State,* 2005 WY 73, ¶ 25, 115 P.3d 14, 26 (Wyo.2005).

[¶ 20] As noted above, Carter was coherent during the interrogation. Although he denied any knowledge of the events about which the detectives were questioning him, he seemed to understand his situation and what the detectives were asking. He was able to answer questions relating to his name, date of birth, people he knew from the Casper area, details about the general location where the murder occurred, and to provide specific details about his whereabouts the night in question. There is no evidence of such a level of intoxication that would cause us to doubt the video, where he appeared to be coherent and able to understand the meaning of his statements. The fact that Carter claimed to have had approximately a six pack of beer and a "pint" to drink that night does not by itself show that his statements were involuntary. *Id.* at ¶ 25, at 26 (evidence that defendant was intoxicated at time of confession will not, by itself, bar admission). Furthermore, although determination of intoxication as it relates to voluntariness of statements is done on a case-by-case basis, it is worth noting that we have upheld statements in situations where the evidence of intoxication of the defendant was much more certain and extreme than in this case. *See Id.* at ¶¶ 23–28, at 25–28 (statements held voluntary although witnesses corroborated defendant's claims of excessive drinking the night prior to his early morning confession and officer's statements of strong odor of alcohol on defendant's breath); *Stone v. State,* 745 P.2d 1344, 1347–48 (Wyo.1987) (statements upheld where defendant's blood alcohol content was between 0.15 and 0.20 around time of statements and officer noted an of odor of alcohol coming from defendant); *Lonquest,* 495 P.2d at 579–82 (statements upheld where defendant's blood alcohol content was 0.374, one-and-one-half hours prior to statements). Accordingly, we cannot say that Carter's statements were involuntary.

[¶ 21] Therefore, because it has not been shown that Carter's will was overborne due to sleep deprivation or intoxication, it also has not been shown that Carter's trial counsel was ineffective for failing to file a motion to suppress his statements based on those grounds.

### 3. Calling a defense witness who was impeached by the State

[¶ 22] Carter's final claim of ineffective assistance of trial counsel is based on the fact that his trial counsel called a witness, E.W., in his defense who was subsequently impeached by the State. Specifically, Carter claims that because E.W. testified inconsistently with what he told police the night of the murder that his trial counsel was ineffective for calling E.W. as a witness because E.W. was so easily impeached and therefore was not credible to the jury. At trial, E.W. testified on direct examination that he had not been drinking the night of the murder because he was on probation. He further testified that he witnessed Moody get up from a chair and push Carter to the ground and then follow Carter as he tried to walk away. At that point, E.W.'s testimony appeared to favor Carter in that it helped prove that Moody was the aggressor. However, on cross-examination, when asked about being questioned by the police regarding his whereabouts and whether he told the police that he was at a bar earlier in the evening, E.W. denied having spoken with the police at all that night. The State then called, as a rebuttal witness, the police officer who spoke with E.W. the night of the murder. The officer testified that E.W. told him that night

that he and a couple of friends had just returned from the bar and did not see anything that occurred.

[¶ 23] It is clear from the record that the State was able effectively to question the reliability of E.W.'s testimony through cross-examination and use of a rebuttal witness. Carter does not point to any case, and we are aware of none, that stands for the proposition that the mere fact of impeachment of a defense witness equates to ineffective assistance of counsel. Moreover, given the number of witnesses who testified that Carter was the aggressor, it is conceivable that this was defense counsel's only chance to bolster Carter's self-defense argument by offering a witness to provide an alternative view of the events. In that light, calling E.W. as a witness could be reasonable trial strategy, and the fact that the State impeached E.W. does not overcome the presumption that counsel was effective. *See Laing v. State,* 746 P.2d 1247, 1249 (Wyo.1987) (quoting *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.")). In any event, to find Carter's trial counsel ineffective for calling E.W. as a witness would require us to speculate as to the reasoning for calling E.W. as a defense witness and attempt to eliminate any possible reasonable trial strategy for doing so, which we will not do.[2] Accordingly, we cannot say that Carter's trial counsel was ineffective for calling E.W. as a witness.

## CONCLUSION

[¶ 24] Carter's claim of prosecutorial misconduct regarding the use of the phrases "white guy" and "black guy" fails because the

phrases were a legitimate means to describe the parties involved in this case. Furthermore, the phrases were not used in a way that was intended to prejudice Carter, nor could Carter demonstrate any prejudice. Carter's ineffective assistance of trial counsel claim based on counsel's failure to object to those comments fails for the same reasons. Likewise, Carter's ineffective assistance claim based on his trial counsel's failure to file a motion to suppress his statements fails because Carter's will was not overborne due to sleep deprivation or intoxication, and no showing was made of police misconduct during the interview, meaning his statements were voluntarily given to detectives. Finally, Carter's claim of ineffective assistance of trial counsel based upon the calling of E.W. as a witness fails because it cannot be shown that such was not part of counsel's limited trial strategy options.

[¶ 25] Affirmed.

---

**2.** We note that Carter also briefly claims that his trial counsel was ineffective for failing to request a limiting instruction to instruct the jury that it could only consider E.W.'s prior inconsistent statements for purposes of impeachment and not for substantive evidence of a crime. However,

"[c]ounsel may, as a matter of trial strategy, choose not to request a limiting instruction in order to avoid emphasizing the unfavorable evidence." *Beintema v. State,* 936 P.2d 1221, 1228 (Wyo.1997).