# THE SUPREME COURT, STATE OF WYOMING

# 2025 WY 115

OCTOBER TERM, A.D. 2025

October 22, 2025

CHERI LYNN MARLER,

Appellant
(Defendant),

v.         S-24-0200

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Lincoln County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellant:*
> *Office of the Public Defender: Brandon Booth; State Public Defender, Kirk A. Morgan, Chief Appellate Counsel; Deborah L. Roden, Appellate Counsel. Argument by Ms. Roden.*

*Representing Appellee:*
> *Bridget Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General. Argument by Ms. Jones.*

*Before BOOMGAARDEN, C.J., and GRAY, FENN, and JAROSH, JJ., and Hibben, D.J.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HIBBEN, District Judge.**

[¶1]     A Lincoln County jury convicted Cheri Lynn Marler of first-degree murder and child abuse for beating and killing a five-year-old child left in her care.  The district court sentenced Ms. Marler to life in prison without parole, plus a term of five to eight years.  On appeal, Ms. Marler claims the district court erred in holding a suppression hearing outside her presence and erred in denying a motion to suppress her confession.  We affirm.

## ISSUES

[¶2]     We restate the issues on appeal as follows:

      I.     Did the district court err by finding Ms. Marler's confession was voluntary and denying her motion to suppress?

     II.    Did the district court err by conducting the suppression hearing without the defendant present?

## FACTS

[¶3]     Ms. Marler called 911 just before 4:00 p.m. on November 25, 2022, and reported that five-year-old AN had fallen down the stairs at Ms. Marler's home and was not breathing.  Law enforcement and a medical technician responded to the home.  They found AN lying lifeless on the couch.  Her face was covered in fresh bruises.  Her skin was gray and blue from a lack of oxygen.  Ms. Marler was the only adult in the home at the time.

[¶4]     Emergency personnel took AN to the local hospital and then life-flighted her to Primary Children's Hospital in Utah.  AN died early the next morning, November 26th.

[¶5]     Law enforcement immediately suspected AN had been beaten and abused.  After taking AN to the hospital, a police officer asked Ms. Marler to go to the Kemmerer police department for an interview.  She agreed and was not under arrest.  Law enforcement drove her to the police station.

[¶6]     Starting at approximately 5:00 p.m. and continuing for the next six hours, law enforcement officers questioned and interviewed Ms. Marler.  Chief Kahre of the Kemmerer Police Department conducted most of the questioning, though he was joined at different times by Officer Popp and Deputy Ellis of the Lincoln County Sheriff's Office.  Later, two different DCI agents interviewed Ms. Marler as well.

[¶7]     Before the questioning started, officers escorted Ms. Marler into a room at the police station.  She arrived at the police station at approximately 4:35 p.m.  Chief Kahre arrived at 4:44 and used the next ten or fifteen minutes to set up the interview.  Chief Kahre and

1

Officer Popp activated their body-worn cameras and recorded the interview. Before the formal interview started, Chief Kahre's body cam recorded the following:

> Chief Kahre: First off, I want you to know you're down here voluntarily. You're free to go at any time.
>
> Marler: No, I'll talk. I'll talk.

[¶8] Chief Kahre shut the door, again reminding Ms. Marler that she was free to leave and that the door was not locked. Officer Popp then told Ms. Marler she was free to leave and read *Miranda* warnings to Ms. Marler. Those warnings included an advisement that she had the right to be silent, the right to have an attorney present while being questioned, and the right at any time to exercise these rights and not make any statements. Ms. Marler said "yes" when asked if she understood these rights and when asked if she wanted to talk with the officers.

[¶9] Chief Kahre conducted about an hour of the questioning. Ms. Marler told Chief Kahre that she found AN lying at the bottom of the stairs. She said she called 911 after AN became lifeless. After about the first 40 minutes of the interview, Chief Kahre left the police department to get an update on AN's condition and complete other work on the case.

[¶10] What occurred during the next two hours and twenty minutes is not contained in the record before this Court, except that Ms. Marler stayed at the police department. At approximately 8:20 p.m., two agents from the Department of Criminal Investigation joined the questioning. One of the DCI agents asked Ms. Marler if she had received *Miranda* advisements from Officer Popp, and if she understood those rights. He asked, "And you said, I'm assuming, you understood those?" Ms. Marler said "yes." The DCI agent then said, "Because you are in a custodial setting, that's why I want to make sure you have those given to you." Throughout the next two hours, DCI agents confronted Ms. Marler about "the evidence [they] had been shown versus the evidence that she was explaining[.]" One agent admitted he raised his voice while questioning Ms. Marler about this evidence. Up to three officers were in the room at one time with Ms. Marler during questioning.

[¶11] Ms. Marler took several bathroom and cigarette breaks during the questioning. She went to the restroom alone, although law enforcement followed her and stood at the door. Her husband waited at the police department. The district court found, on at least one occasion, she took a cigarette break with her husband while no officers were present.

[¶12] At approximately 9:00 p.m., Chief Kahre returned to the police department. He continued his questioning of Ms. Marler and confronted Ms. Marler with inconsistencies in her story.

2

[¶13] By 11:00 p.m., Ms. Marler confessed to beating AN with a metal barbecue spatula and wooden kitchen utensil, and to clapping or boxing both sides of AN's face with her open hands. She also confessed to kicking or pushing AN, and she told officers that she made up the story about AN falling down the stairs. After giving her confession, Ms. Marler left the police station. She was arrested the following day shortly after AN died.

[¶14] The State charged Ms. Marler with first-degree murder in violation of Wyoming Statute § 6-2-101(a) and child abuse in violation of Wyoming Statute § 6-2-503(b)(i). Ms. Marler filed a pretrial motion to suppress her confession, arguing it occurred during a custodial interview, was involuntarily given, and that she had not knowingly and voluntarily waived her *Miranda* rights. Furthermore, she argued she was under the influence of prescription pain medications at the time she gave the confession.

[¶15] The district court scheduled a hearing on the suppression motion. However, Ms. Marler did not appear at the hearing. The following exchange took place at the beginning of the suppression hearing:

> Court: . . . Welcome, Counsel. I don't see, Ms. Marler. Is there something that I need to know?
>
> [Defense counsel]: Yes, Your Honor. Ms. Marler notified me late last night that she is at the ER. She reports that she either has sepsis or MRSA and as of late last night those results were not yet back. She let me know that she would stay at the hospital dressed for court if she was -- needed to be here. I let her know that this is a motions hearing and that we could proceed on that motions hearing without her, was not expecting any testimony from her and certainly happy to communicate to her the events of this morning.
>
> . . . .
>
> Court: . . . Rule 43 . . . Maybe it's just me that I want to hear from the . . . defendant in person. Let me, let me get a look for a moment here, Counsel. . . . The presence is not required according to Rule 43(c) . . . . It states the presence is not required if it's a corporation, that's not applicable, and prosecution for offenses punishable by fine or imprisonment for not more than a year or both, and that's not at -- relevant here, or a conference or argument upon a question of law. So I presume that that's the item that you're referring to, [Defense Counsel]; is that correct?

3

[Defense counsel]:  It is, Your Honor. Thank you.

Court:  Does the State have any objection that you'd like to set forth? . . . .

[State]:  No, Your Honor. Based on the representation of the counsel, no objection from the State of Wyoming.

[¶16]  Based upon defense counsel's consent, the district court held the hearing on the motion to suppress without Ms. Marler's presence.  Neither Ms. Marler nor her trial counsel suggested Ms. Marler appear by video.

[¶17]  The State called Chief Kahre, Officer Popp, and Special Agent Allison from DCI as witnesses.  It introduced three video exhibits showing the *Miranda* advisements and Ms. Marler's verbal acknowledgment of those rights, Ms. Marler's decision to speak with law enforcement, and law enforcement officers telling her she was not in custody and that she was free to leave at any time.  Chief Kahre testified "she was allowed to come and go as she pleased[.]"  Chief Kahre testified about the circumstances of Ms. Marler's confession, but the State did not introduce the video of the confession.

[¶18]  Ms. Marler complained of being in physical pain throughout the hours of questioning.  The district court received evidence that Ms. Marler took 20 milligrams of oxycodone and 800 milligrams of gabapentin approximately twenty minutes before the interview began.  She had taken more medications at her home shortly before law enforcement arrived.  Ms. Marler has prescriptions for these medications and took those medications therapeutically.  Despite taking these therapeutic medications, each officer testified they never observed any sign of impairment in Ms. Marler.  They testified she was able to walk without difficulty, spoke clearly and intelligently, and was able to pull a cigarette out of the pack and light it without struggle or difficulty.  She did not ask officers to repeat their questions.  Chief Kahre testified he had known Ms. Marler for ten years, and during the interview "she was the Cheri that I knew.  I didn't pick up on any slurred speech, she was coherent."

[¶19]  The district court denied the motion to suppress, finding Ms. Marler knowingly and voluntarily waived her *Miranda* rights, her confession was voluntary and not compelled, and she was not impaired during the interview.  The district court also found that Ms. Marler was not subject to custodial interrogation and was not under arrest on the evening of November 25, 2022.  Instead, she was permitted to leave the police station, even after confessing to beating AN, and was not arrested until the following day.  The district court ruled Ms. Marler's confession was therefore admissible at trial.

[¶20]  The case went to jury trial in May of 2024.  The State and Ms. Marler did not dispute the nature of AN's injuries, but they differed on the cause of death.  The State argued AN

4

died as a result of abuse inflicted by Ms. Marler. Ms. Marler renounced her confession and argued AN died as a result of a fall down the stairs or a fall off a backyard swing set. She also claimed AN may have been harmed by another person, namely, AN's mother. However, trial evidence showed AN's mother last saw AN two weeks before the incident.

[¶21] Because the district court denied Ms. Marler's suppression motion, the jury heard evidence about Ms. Marler's confession. A video of Chief Kahre's officer-worn body camera showed the confession. As relevant here, the video showed Chief Kahre and Ms. Marler beginning the interview inside a room at the police department. Chief Kahre told Ms. Marler that she "needed to come clean" and that the things she had been saying up that point did not make sense. He also told her, "No matter what you tell me tonight, I'm not going to take you to jail tonight."

[¶22] Ms. Marler then interrupted and said, "I hit her with a spatula, I did it." She asked to smoke a cigarette, and Chief Kahre and Ms. Marler exited the police department and walked outside. The questioning continued. Ms. Marler, visibly angry at AN for "stealing and lying," sat on the sidewalk, lit a cigarette, and told Chief Kahre what happened. She explained that she had been having a hard time with AN, and she had just "snapped" and hit AN in the face several times that day. Ms. Marler admitted that AN did not fall down the stairs. AN went limp and became unconscious about 10 minutes after Ms. Marler hit her. She stated, "I just had enough. I just had enough." She also stated, "I'm a [] horrible person for hitting a [] child." "I need help because I hit a [] child."

[¶23] Ms. Marler finished her cigarette, then she and Chief Kahre went back inside the room at the police station. Once inside and unprompted by any question from Chief Kahre, Ms. Marler mimicked the way she hit AN: clapping her two hands together as if AN's face was in between. Then, as Chief Kahre testified, Ms. Marler "wound up her right hand and swung it across her body and went 'Boom.'" Ms. Marler said AN came to apologize a few moments later, but Ms. Marler pushed or kicked her away with her foot to AN's chest. At some point after that exchange, Ms. Marler said she found AN limp and unresponsive on the house floor. She then called 911.

[¶24] As part of the jury instructions, the district court instructed the jury that Ms. Marler's confession "shall be considered by you only if you find that such statements were made voluntarily in whole or in part. If you find such statement is involuntary, then you must reject it." The instruction further explained that if the jury chose to consider a statement which it found voluntarily given, the jury must consider that statement "together with all other evidence" and "give the statement such weight and credibility as you see fit." The jury—as the trier of fact—could have concluded Ms. Marler's confession was coerced or unreliable and could have chosen to give it little or no weight as part of their deliberations.

[¶25] After deliberating, the jury found Ms. Marler guilty of first-degree murder and child abuse. This timely appeal followed.

5

### I. Did the district court err by finding Ms. Marler's confession was voluntary and denying her motion to suppress?

#### A. Standard of Review

[¶26]  This Court reviews rulings on a motion to suppress on the grounds that a confession was made involuntarily as follows:

> [We] defer to the trial court's findings of fact unless those findings are clearly erroneous. This Court considers all the evidence in the light most favorable to the trial court's determination because the trial court has the opportunity to hear the evidence and to assess the credibility of the witnesses.

*Goulart v. State*, 2003 WY 108, ¶ 6, 76 P.3d 1230, 1232-33 (Wyo. 2003).

[¶27]  "Voluntariness is a legal question; thus, we review the ultimate issue, whether a defendant's statements were voluntary, de novo." *Pena v. State*, 2004 WY 115, ¶ 7, 98 P.3d 857, 862 (Wyo. 2004) (citations omitted).  This Court looks to the totality of the circumstances to determine if the defendant's statements were voluntary. *Id.*

#### B. Discussion

[¶28]  A defendant's confession is one of the most powerful and persuasive forms of evidence in a criminal prosecution. *See, e.g.*, *Carter v. State*, 2010 WY 136, 241 P.3d 476 (Wyo. 2010).  However, whether a confession is admissible or not hinges upon the way it was obtained. *State v. Evans,* 944 P.2d 1120, 1125 (Wyo. 1997) (citing *Coyote v. United States,* 380 F.2d 305, 310 (10th Cir. 1967), *cert. denied,* 389 U.S. 992, 88 S. Ct. 489, 19 L. Ed. 2d 484 (1967); *People v. Scott,* 198 Colo. 371, 600 P.2d 68, 69 (1979)).  In our legal system, a confession flowing from a person's free and deliberate choice is a cornerstone of a just and proper conviction, but a confession extracted through coercion, intimidation, or improper influence may lead to a conviction built upon a pile of sand. *See id.* at 1127 ("Underlying these judicial determinations is a belief that the dignity of the individual, the dignity of our society, and the risk of unreliable confessions require that we not permit the government to employ those tactics which would coerce confessions.").

[¶29]  These foundational tenets are rooted in both the United States and Wyoming Constitutions.  Under both, a defendant's confession or admission must be voluntary to be admissible at trial. *Carter*, ¶ 15, 241 P.3d at 484.  The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V.  Article 1, § 11 of the Wyoming Constitution promises that "[n]o person shall be compelled to testify against himself in any criminal case[.]"  The Due

Process Clauses of the Fifth and Fourteenth Amendments forbid the use of involuntary confessions. *Chambers v. Florida*, 309 U.S. 227, 237–38, 60 S. Ct. 472, 477–78, 84 L. Ed 716, (1940). Coercive police tactics also violate the due process clause of Wyo. Const. Art. 1, § 6, and statements extracted by such tactics may be suppressed. *Rodriguez v. State*, 2018 WY 134, ¶ 33, 430 P.3d 766, 774 (Wyo. 2018). *See also Pena,* ¶ 7, 98 P.3d at 862; *Rice v. State*, 2004 WY 130, ¶ 7, 100 P.3d 371, 374 (Wyo. 2004) (admission of an involuntary statement violates due process); *Goulart,* 2003 WY 108, ¶ 6, 76 P.3d at 1233 ("A defendant is deprived of the right to due process of law if an involuntary statement is admitted at his trial.").

[¶30] Thus, our federal and state Constitutions provide overlapping and mutually reinforcing protection against the use of coerced or involuntary statements at trial. *See Evans,* 944 P.2d at 1124–25. Under both instruments, the State must build its cases through evidence independently and freely secured and not by compelling the accused to furnish the very materials of their own condemnation. *See id.* at 1128–29 (holding that the State had not met its burden of proof that a statement was made voluntarily). This distinction dictates the evidentiary outcome: a voluntarily confession is admissible, while an involuntary one will be suppressed. *See id.*

[¶31] In determining voluntariness, we examine the totality of the circumstances. *Carter,* ¶ 15, 241 P.3d at 484. This fact-intensive inquiry includes consideration of factors such as:

> whether the defendant was in custody or was free to leave and was aware of the situation;
>
> whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights;
>
> whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation;
>
> whether the challenged statement was made during the course of an interrogation or instead was volunteered;
>
> whether any overt or implied threat or promise was directed to the defendant;
>
> the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and

the defendant's mental and physical condition immediately prior to and during the interrogation, as well as educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*Id*. at ¶ 15, 241 P.3d at 485–86 (citation modified).

[¶32]  In *Carter*, we applied these factors to consider whether an intoxicated, sleep-deprived suspect voluntarily confessed to murder. *Id*. at ¶ 16, 241 P.3d at 486.  Finding the defendant's will was not overborne, we noted that the defendant received *Miranda* warnings, told officers he understood those rights, was not subject to threats or promises, was not deprived of food or water, and was lucid throughout most of the interrogation. *Id*. at ¶ 18, 241 P.3d at 487.  Although he asserted intoxication, he "seemed to understand his situation and what the detectives were asking." *Id*. at ¶ 20, 241 P.3d at 488.

[¶33]  In *Snyder*, we considered the circumstances surrounding a confession to murder and found the confession was not the result of coercive conduct. *Snyder v. State*, 2021 WY 108, ¶ 49, 496 P.3d 1239, 1253 (Wyo. 2021).  While there were facts that could support a finding that the defendant's confession was involuntary—he had a history of significant mental illness, he was not wearing socks or shoes, and the interview lasted four hours—the totality of the circumstances showed the State had proven the confession was voluntary. *Id*. at ¶ 45, 496 P.3d at 1251–52.  The defendant waived his *Miranda* rights and agreed to speak with law enforcement, he was not physically restrained, the interview was conversational and law enforcement never made any threats, and the defendant "was the clearest" law enforcement had ever seen him. *Id*. at ¶ 46, 496 P.3d at 1252.

[¶34]  Other cases demonstrate the opposite end of the voluntariness spectrum.  In *Frias,* this Court held a confession was involuntary due to a defendant's inability to speak or understand the English language. *Frias v. State*, 722 P.2d 135 (Wyo. 1986).  And in *Evans*, this Court upheld the trial court's decision that the State did not prove defendant's statements were voluntary where the police officer's interview, technique, tone, and approach were aggressive, insistently accusatory, and demanding. *State v. Evans*, 944 P.2d, 1120, 1128–29 (Wyo. 1997).

[¶35]  Ms. Marler's situation is comparable to those in *Carter* and *Snyder*.  Here, as in those cases, there are factors that might weigh against voluntariness, such as the length of the interview or Ms. Marler's use of pain medication.  Those factors are overcome by the non-coercive nature of the interview and the absence of any indication that her will was overborne.  The physical environment was not coercive.  The interview occurred in an unlocked room, and she was told she was free to leave anytime.  Her confession occurred while she was outside the police station.  The video of that confession shows Chief Kahre standing by the door to the police station while Ms. Marler sat on the sidewalk smoking a cigarette with her back to the parking lot or exterior area of the station.  After giving that

confession, she walked back inside the police station and further described how she smacked and beat AN.

[¶36] The interview included no punishment or threats. Law enforcement told her she would not be arrested that night. In fact, she was not arrested even after confessing to beating AN. Instead, law enforcement conducted further investigation and did not arrest Ms. Marler until AN died the following morning. Ms. Marler received and acknowledged that she understood her *Miranda* rights. Law enforcement informed her of her right to speak to an attorney, and she said she understood that right. She took multiple cigarette and bathroom breaks and was not continuously questioned. Nothing about Ms. Marler's age, intelligence, or education made her particularly susceptible to coercion. As the district court found, Ms. Marler was responsive to questioning, was oriented to her surroundings, and had no trouble walking, moving, lighting cigarettes, or using fine motor skills.

[¶37] Although she asserts that she was under the influence of prescription pain medication, she remained lucid and coherent throughout. She personally knew at least two of the police officers. Chief Kahre testified she was not impaired, and that "she was the Cheri I knew."

[¶38] While the entire video recording was not offered as an exhibit at the suppression hearing, the district court heard comprehensive testimony from eyewitnesses describing the events in detail. The district court weighed the testimony, assessed witness credibility, and concluded Ms. Marler's statements were the product of her free and deliberate choice. Its factual findings are supported by the record and are not clearly erroneous.

[¶39] The district court correctly applied the totality of the circumstances test to determine voluntariness. It held the State to its burden of proof and made detailed factual findings that are supported by the record. The district court did not err in finding Ms. Marler voluntarily confessed to beating AN. Therefore, it did not err in denying Ms. Marler's motion to suppress.

## II. Did the district court err by conducting the suppression hearing without the defendant present?

### A. Standard of Review

[¶40] Whether a defendant has the right to be present at a "critical stage" of a criminal proceeding is a question of law that we review de novo. *Castellanos v. State*, 2023 WY 97, ¶ 11, 536 P.3d 732, 734 (Wyo. 2023). Our review focuses on whether the right to be present is waivable, and if so, whether the defendant "voluntarily, knowingly and intelligently waived that right." *Id.* at ¶ 15, 536 P.3d at 735. If the right was not waived, the Court proceeds to a harmless error analysis under which the State has the burden of showing a violation of the defendant's right to be present was harmless. Wall v. State, 2019 WY 2,

¶ 33, 432 P.3d 516, 526 (Wyo. 2019) (citing *Seeley v. State*, 959 P.2d 170, 178 (Wyo. 1998)). In determining whether the error was harmless, "we ask if the defendant's absence created any reasonable [probability][1] of prejudice." *Seeley*, 959 P.2d at 178 (citation omitted).

## B. Discussion

[¶41] Ms. Marler and the State each address whether Ms. Marler waived her right to be present. The constitutional right to be present may be waived by a defendant's voluntary absence. *Castellanos*, 2023 WY 732, ¶ 15, 536 P.3d at 735. An absence is voluntary if "the defendant knew of the hearing and failed to appear due to circumstances that were within her control." *Id.* at ¶ 16, 536 P.3d at 735 (internal citations omitted).

[¶42] The circumstances of *Castellanos* are distinguishable from those present here. In *Castellanos*, we found a defendant's refusal to leave his jail cell to attend a pretrial hearing constituted a voluntary waiver. *Id.* at ¶ 17, 536 P.3d at 736. We concluded that because he had notice of the hearing and the opportunity to attend, his failure to appear was the result of circumstances within his control. *Id* at ¶ 18, 536 P.3d at 736. But here, Ms. Marler was at the emergency room the evening prior to her suppression hearing and remained hospitalized for a medical condition beyond her control. *See also Maupin v. State*, 694 P.2d 720, 723-24 (Wyo. 1985) (holding that the absence of a defendant at trial was not voluntary where the defendant was hospitalized).

[¶43] Therefore, on this record, we cannot conclude Ms. Marler knowingly and intelligently waived her right to be present at the suppression hearing. We then proceed to a harmless error analysis. *See Skinner v. State*, 2001 WY 102, ¶ 23, 33 P.3d 758, 766 (Wyo. 2001) ("[T]he absence of a defendant during a conference with the court, even though of constitutional proportion, is subject to a harmless error analysis.").

[¶44] Although she is not obligated to establish prejudice, Ms. Marler contends on appeal that her absence from the hearing was prejudicial. If present, she claims she could have:

---

[1] Our previous cases have used the phrase "reasonable possibility" when discussing the standard we apply in harmless error cases. *See, e.g., Wall*, ¶ 33, 432 P.3d at 526; *Wilde v. State*, 2003 WY 93, ¶ 30, 74 P.3d 699, 711 (Wyo. 2003) (citation omitted) (stating harmless error requires the Court to conclude there is "a reasonable possibility that the verdict might have been more favorable to the defendant had the error not occurred"). In *Sullivan v. State*, we concluded any difference between the "reasonable possibility" and "reasonable probability" standards is "illusory" in the context of appellate review. 2025 WY 5, ¶ 33 n.7, 561 P.3d 780, 788 n.7 (Wyo. 2025). We concluded, to ensure consistency going forward, the appropriate question where an Appellant bears the burden of showing prejudice under harmless error analysis was whether there was a reasonable probability the result would have been more favorable to the defendant had the error not occurred. *Id*. We reach the same conclusion for analyzing prejudice under all harmless error analyses, regardless of who bears the burden of proving or disproving prejudice, and we will use the reasonable probability standard going forward.

1. Corrected a factual inaccuracy in Chief Kahre's testimony. Specifically, she contends she could have testified that she was not, in fact, allowed to use the bathroom alone, contrary to the Chief's testimony.

2. Clarified another factual point. In its ruling, the district court noted that it did not know where Ms. Marler went after the interview concluded. Ms. Marler argues she could have informed the court that she went to a motel with her husband.

3. Made a different strategic choice. She argues that she could have chosen to testify at the suppression hearing to explain that her confession was not voluntary but was instead motivated by a desperate desire to end the questioning, leave the police station, and see her husband.

[¶45] The State counters that Ms. Marler did not suffer any prejudice because her presence would not have affected the outcome of the hearing. The State argues the two factual points raised by Ms. Marler are minor in detail and are of no legal consequence, and that Ms. Marler's counsel could have, and in fact did, pursue her legal theory through cross-examination and legal argument regardless of whether Ms. Marler was present or not.

[¶46] We agree with the State. Under the circumstances here, we are unable to find a reasonable probability of prejudice, and we conclude the State met its burden.

[¶47] The ultimate legal question at the suppression hearing concerned the voluntariness of Ms. Marler's confession. To decide that question, the district court needed to weigh whether, under the totality of the circumstances, Ms. Marler's will was overborne by law enforcement action. *Carter*, 2010 WY 136, ¶ 15, 241 P.3d at 485. The district court found no coercion, observed Ms. Marler's lucidity and coherence, and concluded her will was not overborne.

[¶48] Ms. Marler's absence did not undermine any of those findings. Law enforcement repeatedly told Ms. Marler she was free to leave the police station and was allowed to take numerous breaks. Whether Ms. Marler went to the bathroom alone or not was only one detail that might show Ms. Marler was free to move around the police station, go outside, and potentially leave. She ultimately confessed outside the police station while smoking a cigarette and sitting on a sidewalk. We can see no reasonable probability that Ms. Marler's absence from the suppression hearing would have changed the district court's conclusion about the non-coercive nature of the interview.

[¶49] Moreover, wherever Ms. Marler went after the interview is immaterial. The district court noted that Ms. Marler was not arrested until the following morning, a fact which weighed heavily in its determination that Ms. Marler was not coerced into confessing. Had the district court been told that Ms. Marler left the police station and checked into a motel

11

with her husband, this would have only strengthened the conclusion that she was, in fact, free to leave the interview. This information, if known, presents no reasonable probability of prejudice. To the contrary, it would have bolstered the State's position.

[¶50] Ms. Marler also argues she could have chosen to testify at the suppression hearing if she were present. This argument is speculative and is contradicted by the record of the strategic decisions made by her and her counsel before the hearing. Whether Ms. Marler was present or not, her attorney could have explored through cross-examination her theory that she confessed only because she was desperate to leave.

[¶51] Having received an unfavorable ruling and with the benefit of hindsight, Ms. Marler now claims—for the first time on appeal—that she could have testified if present at the suppression hearing. But the record is not silent as to why Ms. Marler did not testify. Her counsel informed the district court that she "was not expecting any testimony" from Ms. Marler. That statement reflects a tactical decision by the defense. It can be assumed that this strategy relied on cross-examination of the State's witnesses to form a legal argument that the State failed to meet its burden of proof without subjecting Ms. Marler to risks of testifying and being cross-examined herself. Furthermore, even though she was not present, she was "dressed for court" and ready to come "if she was needed." Given her counsel's representation that she would not testify and was not needed, it is unlikely Ms. Marler's presence would have resulted in her counsel taking any different action than she did. To find a reasonable probability of prejudice on such a basis would be to allow defendants to reverse their own tactical decisions on appeal. Instead, we find no reasonable probability of prejudice under these circumstances.

[¶52] Our conclusion is supported by our precedent. In *Skinner*, we found harmless error where a defendant was absent from an *in-camera* hearing held by the trial judge with a juror who had expressed confusion about the guilt phase of a trial but before the habitual criminal phase. *Skinner,* 201 WY 102, ¶¶ 19–24, 33 P.3d at 765-66. This Court concluded the hearing was a critical stage and therefore analyzed the absence for harmless error. *Id.*

[¶53] The reasoning in *Skinner* is instructive. There, this Court focused on the scope of the hearing and the lack of any reasonable probability that the defendant's presence would have altered the outcome or changed his counsel's actions. *Id.*

[¶54] As in *Skinner*, there is no reasonable probability that Ms. Marler's presence would have changed the outcome. The district court's decision was based on the entirety of the evidence, which it found showed a lucid and coherent individual, and the testimony of witnesses, which it found credible. It is not reasonably probable that Ms. Marler's subjective testimony about her pain and desire to leave would have overcome the objective evidence of her demeanor and ability to end the interview.

[¶55] We conclude that the State has successfully carried its burden. It has demonstrated there is no reasonable probability Ms. Marler's absence from the suppression hearing resulted in prejudice. The factual assertions she proposes are immaterial to the district court's voluntariness analysis. Her claim that she might have testified is belied by her counsel's statements and the tactical decisions reflected in the record. Assuming the district court committed constitutional error by conducting the suppression hearing in Ms. Marler's absence, we hold that the error was harmless beyond a reasonable doubt.

## CONCLUSION

[¶56] The record supports the district court's conclusion that Ms. Marler's confession was voluntary. It did not err in denying her motion to suppress. Likewise, any error in conducting the suppression hearing in Ms. Marler's absence was harmless.

[¶57] Affirmed.